Sergio JIMENEZ, as Personal Representative of the Estate of the Late Sergio Hernandez Jimenez, II, Plaintiff,

v.

CHRYSLER CORPORATION, Defendant.

No. CivA. 2:96–1269–11.

United States District Court, D. South Carolina, Charleston Division.

Dec. 2, 1999.

Reese Irby Joye, Mark Christopher Joye, Joye Law Firm, N. Charleston, SC, John R. Gerstein, Ross Dixson & Masback, Washington, DC, David R. Dwares, Ross Dixon & Masback, Washington, DC, for Sergio Jimenez, plaintiff.

Wade H. Logan, III, Nelson, Mullins, Riley & Scarborough LLP, Charleston, SC, Mia Lauren Maness, Mark C. Tanenbaum PA, Charleston, SC, Glenda L. Laws, Yates, McLamb and Weyher, L.L.P., Raleigh, NC, Eric R. Miller, Oppenheimer, Wolff & Donnelly, Minneapolis, MN, David Tyrrell, Hill, Ward & Henderson, Tampa, FL, for Chrysler Corporation, defendant.

## ORDER

HAWKINS, Senior District Judge.

This matter is before the court on defendant's motions for judgment as a matter of law and for new trial absolute, or, in the alternative, new trial nisi remittitur. This case was tried before a jury from September 11, 1997 through October 8, 1997. The jury returned a verdict in Plaintiff's favor. This court entered judgment on October 9, 1997. Defendant timely moved for judgment as a matter of law and for new trial and Plaintiff opposed the motions.

### I. FACTUAL BACKGROUND

This products liability case was tried on plaintiff's complaint, alleging that the liftgate latch in the Jimenez family's 1985 Dodge Caravan minivan was defective and unreasonably dangerous. (Compl.¶ 18) As a result of the defective design, plaintiff claims that the latch failed, allowing the liftgate to open in a rollover accident on April 10, 1994. (Compl. ¶¶ 13 and 14) During the rollover, Plaintiff's son, Sergio Hernandez Jimenez, II ("Sergio"), was ejected from the minivan through the open rear door and killed. (Compl.¶ 18).

Plaintiff's claims originally included strict liability, breach of implied warranty, negligent misrepresentation, unfair and deceptive trade practices and negligence. At trial, the plaintiff presented his case on theories of strict liability, negligent

misrepresentation and negligent design. Following arguments of counsel and the instructions of this court, the case was submitted to the jury, and the jury returned with a verdict in Plaintiff's favor for Twelve Million Five Hundred Thousand Dollars in actual damages and Two Hundred Fifty Million Dollars punitive damages.

## II. DEFENDANT'S RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant Chrysler Corporation ("Chrysler") moves for judgment as a matter of law based upon various alleged failings of plaintiff's case. Only two of these alleged deficiencies were addressed in the defendant's memorandum in support of the Motion. Specifically, Chrysler argues that 1)Plaintiff failed to present sufficient evidence of negligent misrepresentation, and 2) Plaintiff failed to present sufficient evidence to support an award of punitive damages.

### A. Standard under Rule 50

Federal Rule of Civil Procedure 50(b) allows this court to grant a party judgment as a matter of law even after a jury has rendered its verdict. Under Rule 50(a), a motion for judgment notwithstanding the verdict is simply a renewed post-trial motion for a judgment as a matter of law. Such motion should be granted when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue," Rule 50(a)(1), FRCP. When ruling on a motion for a judgment notwithstanding the verdict, a court should not weigh the evidence or appraise the credibility of the witnesses, but must view all the evidence in the light most favorable to the nonmoving party and draw all legitimate inferences in his favor. *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir.1992), *cert. denied*, 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). Judgment as a matter of law may be granted only when there is no substantial evidence to support recovery by the party against whom the motion is directed. *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 100 (4th Cir.1991).

### B. Plaintiff's Negligent Misrepresentation Claim

Defendant argues that Plaintiff failed to present evidence to support the jury's finding of liability on negligent misrepresentation. According to Chrysler, Plaintiff did not establish that Chrysler made any false representation to Plaintiff, that there was reliance upon any particular representation because any advertisements viewed merely offered opinion, or that Plaintiff suffered any pecuniary loss.

This court finds that Chrysler failed to raise the issues regarding any false representation, opinion or pecuniary loss in its Rule 50(a) motion at trial. While Chrysler did recite what it contended were the elements of negligent misrepresentation, no reference to "false representation," "opinion," or "pecuniary loss," were made. Rather, Chrysler specifically argued only regarding its contention that Plaintiff Jimenez had failed to prove reliance and proximate causation.

Because Chrysler failed to object at trial, it is barred from raising these issues in the first instance in its Rule 50(b) motion. *See Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1248–49 (4th Cir.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997) (holding that a party must assert the same reasons in its Rule 50(b) motion as advanced in its Rule 50(a) motion); *see e.g. Whelan v. Abell*, 48 F.3d 1247, 1251 (D.C.Cir.1995) ("[T]he precise claim made in the motion [under Rule 50(b)] must have been made [under Rule 50(a)]."); *Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614, 617 (3d Cir. 1989) (Judgment as a matter of law made post trial must advance the same issues interposed when the Rule 50 motion was first made.). Therefore, Chrysler is not entitled to judgment as a matter of law on

the negligent misrepresentation claim on those issues not raised at trial: making a false representation, opinion, and pecuniary loss.

█ With regard to proof of reliance and proximate causation, this court finds that Plaintiff proved not only that the representation of safety was relied upon, but also that the omission of information was relied upon. Further there was evidence presented from which the jury could have reasonably found that such reliance was a proximate cause of Plaintiff's damages.

█ "As a general rule, a person who undertakes to make a representation is liable for negligent misrepresentation if a plaintiff suffers physical injury from reliance upon the misrepresentation." F.P. Hubbard & R.L. Felix, *The South Carolina Law of Torts*, p. 357 (2d ed.1997). The South Carolina Supreme Court has stated:

> 'A duty to exercise reasonable care in giving information exists when the defendant has a pecuniary interest in the transaction.' 'The recovery of damages may be predicated upon a negligently made false statement where a party suffers either injury or loss as a consequence of relying upon the misrepresentation.' These general rules have been applied ... to support the recognition of a negligent misrepresentation claim where the misrepresented fact(s) induced the plaintiff to enter a contract or business transaction.

*Evans v. Rite Aid Corp.,* 324 S.C. 269, 478 S.E.2d 846, 848 (1996), *quoting Gilliland v. Elmwood Properties,* 301 S.C. 295, 391 S.E.2d 577, 580 (1990) (citations omitted).

According to Chrysler, there is no evidence demonstrating that the Jimenez family relied on any misrepresentations. South Carolina has adopted the Second Restatement view for analyzing the reliance element in a negligent misrepresenta-

tion claim. *See ML–Lee Aquisition Fund, L.P. v. Deloitte & Touche,* 327 S.C. 238, 489 S.E.2d 470, 472 (1997). According to the Second Restatement, direct reliance by a particular plaintiff is not required. Chrysler's "supply[ing] the information for repetition to a certain group or class of person [of which Mr. Jimenez] is one, even though [Chrysler] never had heard of [Mr. Jimenez] by name when the information was given" is sufficient for imposing liability. *See Restatement (Second) Torts* § 552 cmt. h (1977).

In this case, Ms. Barrientos, Sergio's mother, testified that she saw commercials that led her to believe that Chrysler minivans were safe vehicles. (Tr. 1072) Robert Eaton, Chrysler's CEO, testified that consumers "absolutely" have "a right to expect" safe vehicles from Chrysler. (Deposition of Robert Eaton, at 44.[1]) The jury reasonably could infer from this evidence that the Jimenez family would not have bought their minivan had Chrysler not misrepresented the vehicle as safe. Moreover, Ms. Barrientos' reliance on Chrysler's silence regarding the latch was demonstrated by her utilizing the minivan in ignorance of the non-disclosed defect, believing it to be safe and suitable to transport her children, allowing her son to sit in the third seat (by the rear door), and not seeking to have a headed striker installed, unknowing of its importance or availability.

Assuming arguendo, that Chrysler preserved the issues of "false representation," "opinion," or "pecuniary loss," for consideration by this court post-trial, the court still concludes that judgment as a matter of law as to Plaintiff's claim of negligent misrepresentation is inappropriate. Even disregarding Chrysler's procedural default, it cannot succeed on the merits.

As to false representation, Chrysler argues that it made no representation to Plaintiff and that any representation allegedly made was not false, essentially con-

---

1. Citations to deposition transcripts refer to those depositions that, at trial, either were read to the jury or played to them on video-

tape and which were, by express consent and agreement of the parties and the Court, made a part of the record.

tending that a misrepresentation must be an affirmative misstatement. This contention is contrary to the evidence and to well-settled South Carolina law. At trial, it was unrebutted that Chrysler touted the safety of all its minivans in advertising. Eaton testified that "yes," one of the ways by which minivans were sold was with "promises of safety," that "image" was "critical" to Chrysler's ability to sell minivans, that Chrysler "advertise[s] safety on all of our vehicles" and that people have a "right" to expect a safe vehicle from Chrysler. (Deposition of Robert Eaton at 18, 44) The fair reading of Eaton's testimony is that Chrysler minivans carried with them "promises of safety" because this description was "critical" to the minivans' "image." With all inferences in favor of Jimenez, the evidence further showed that commercials stressing safety, among other things, influenced Ms. Barrientos, in deciding to purchase the subject minivan. (Tr. 1072)

Moreover, there was abundant additional evidence to support Plaintiff's claim of negligent misrepresentation by virtue of Chrysler's misrepresentation by silence when there was a duty to speak. In this regard, Jimenez introduced uncontroverted evidence that Chrysler had an ongoing duty to notify consumers of the defect in its latch. For example, one of Jimenez's expert witnesses, Ronald Elwell, expressly opined, in testimony that was unrebutted by Chrysler, that Chrysler had a duty to notify consumers who had unheeded strikers that there was a defect in consumers' vehicles. (Tr. 740, 744–45) The law also mandates a continuing duty by automobile manufacturers to disclose defects. *See* 49 U.S.C.A. § 30118–30120.[2] *See also Nevels v. Ford Motor Co.*, 439 F.2d 251, 258 (5th Cir.1971) (under 15 U.S.C. § 1402, if a manufacturer discovers "in one car a defect common to automobiles manufactured by it, [it] then [has] a duty to notify other

purchasers"); *United States v. General Motors Corp.*, 574 F.Supp. 1047, 1050 (D.D.C.1983) (holding that 15 U.S.C. § 1411 imposes a "duty on a manufacturer to notify of and remedy safety-related defects even in the absence of an agency order to do so.").

It was undisputed that, at no time between the date of manufacture of the Jimenez minivan and Sergio's death on April 10, 1994, did Chrysler ever notify either Sergio's parents or any other consumers of the defect in the minivans. It was not until approximately a year after Sergio's death that Chrysler sent Plaintiff a notice of the opportunity to replace the rear door latch, albeit even then not stating that the latch was unsafe. (Plaintiff's exhibit 243.)

■ Under South Carolina law, nondisclosure is fraudulent concealment if there is a duty to speak. *See, e.g., Manning v. Dial*, 271 S.C. 79, 245 S.E.2d 120, 122 (1978); *Ardis v. Cox*, 314 S.C. 512, 431 S.E.2d 267, 270 (Ct.App.1993). This precept mandates that "[f]ailure to speak when fair dealing requires one to do so may amount to a suppression of a fact which should have been disclosed, and constitute a fraud." *Gardner v. Nash*, 225 S.C. 303, 82 S.E.2d 123, 127 (1954). Thus, if Chrysler suppressed a material fact that duty obligated it to disclose, it effectively made a false representation. *See Landvest Assocs. v. Owens*, 276 S.C. 22, 274 S.E.2d 433, 434 (1981). Accordingly, state and federal law imposed on Chrysler a duty to disclose.

■ The Court rejects Chrysler's argument to the effect that it was incumbent upon Mr. Jimenez to make a separate claim for negligent misrepresentation by omission. A claim for negligent misrepresentation embraces both misrepresentation by omission and commission. *See id.* at 434. In addition, the Court is not persuaded that Plaintiff failed to plead a breach of

2. The relevant sections at the time were 15 U.S.C. § 1402 *et seq.* They now are codified in 49 U.S.C.A. § 30118 *et seq.*

the duty to disclose. *See* Complaint ¶ 35. In any event, the Court finds that the issue of negligent misrepresentation by omission, if *arguendo* not framed by the pleadings, was tried by the implied consent of the parties.

There was abundant evidence of both the duty to disclose the latch hazard and Chrysler's breach of this duty by failing to disclose the hazard, much of it not objected to by Chrysler during the course of the trial. *See, e.g.,* Tr. 740, 744–45; Deposition of Jerome Mitchell, at 133–34. Nor did Chrysler challenge the articulation of "non-disclosure" as presented in both opening statement and in closing arguments. Under Federal Rule of Civil Procedure 15(b), an issue tried by the implied consent of the parties shall be treated in all respects as if it had been raised in the pleadings. An amendment of the pleadings may be made as necessary to conform them to the evidence, and this may be done even after judgment.

Application of these principles compels the conclusion that Mr. Jimenez succeeded in establishing a false affirmative representation and Chrysler's silence in the face of a duty to speak operated as an active fraud. Chrysler's silence was tantamount to fraud. *See Lawson v. C & S National Bank of S.C.,* 259 S.C. 477, 193 S.E.2d 124, 128 (1972); *Gardner,* 82 S.E.2d at 127.

■ In arguing that there was no reliance, Chrysler also argues that Plaintiff could not rely upon advertisements viewed by Ms. Barrientos as evidence of some representation of fact because, according to Chrysler, those representations were mere opinion, for which a tort claim will not lie. The Court rejects this argument for multiple reasons. First, Chrysler's failure to disclose the existence of a known safety defect to consumers, including Mr. Jimenez and Ms. Barrientos, had nothing to do with opinion. Second, affir-

mative touting by Chrysler of the "safety" of its minivans was not a mere expression of opinion, particularly given Chrysler's knowledge of the flimsy rear door latch and its clear safety implications. In distinguishing a misrepresentation from an opinion, a court examines the defendant's pecuniary interest in the transaction, defendant's expertise or knowledge, the relationship between the plaintiff and defendant, and the circumstances of the transaction. *See AMA Management Corp. v. Strasburger,* 309 S.C. 213, 420 S.E.2d 868, 874 (Ct.App. 1992). If the defendant "possesses expertise or special knowledge that would ordinarily make it reasonable for another to rely on his judgment," then his statements constitute representations, not opinion. *Id.* (citations omitted).

Chrysler possessed a pecuniary interest in its misrepresentations because it sold the minivans, reaping substantial profits, and making statements "in the course of [its] business, profession, or employment is sufficient to show [Chrysler] has a pecuniary interest. . . ." *See id.* (citations omitted). Chrysler enjoyed special expertise and knowledge concerning the minivan, namely that it contained a defective rear door latch, but it did not impart this knowledge to the Jimenez family. As for the relationship between the parties, Chrysler maintained all the advantages: size, superior knowledge and access to information. The Court finds, therefore, Chrysler's statements and silence, when it had a duty to speak, constituted misrepresentations of fact, not mere opinion.

■ Chrysler's also challenges the negligent misrepresentation claim, arguing that Plaintiff Jimenez failed to prove pecuniary loss. This court notes that although the jury instructions referred to pecuniary loss as an element of the tort, that was not a complete description of the law.[3] Under

---

3. This was, at most, a harmless error since Mr. Jimenez was not required to prove pecuniary loss. Further, later in the same instruc-

tion, the Court made clear that it was Sergio's death that was the loss claimed by plaintiff to

South Carolina law, a plaintiff prosecuting a negligent misrepresentation claim that entails physical injury or death is not required to show pecuniary loss. *See, e.g., Evans v. Rite Aid Corp.,* 324 S.C. 269, 478 S.E.2d 846, 848 (1996); *Restatement (Second) Torts* § 311 cmt. c (1977). For example, in *Evans,* the South Carolina Supreme court recently reiterated that " '[t]he recovery of damages may be predicated upon a negligently-made false statement where a party suffers either *injury* or loss as a consequence of relying upon the representation.' " *Evans,* 478 S.E.2d at 848 (citation omitted; emphasis added). It is only where the plaintiff seeks to recover a pecuniary loss that he must prove such loss. *See Harrington v. Mikell,* 321 S.C. 518, 469 S.E.2d 627, 629 (Ct.App.1996). Mr. Jimenez sought to recover only the intangible damage he and Barrientos suffered from the loss of their son—not any pecuniary loss. Consistent with this, the special verdict form that the parties agreed upon expressly put the case to the jury on the basis that a negligent misrepresentation claim was established if the misrepresentation and reliance proximately resulted in Sergio's death. The verdict form, which never mentioned pecuniary loss, was correct.

The negligent misrepresentation claim properly went to the jury and this court declines to award judgment as a matter of law to the defendant on this issue.

### C. Plaintiff's Claim for Punitive Damages

Defendant also argues that judgment as a matter of law is appropriate as to punitive damages. According to Defendant, there is insufficient evidence to support punitive damages in any amount against Chrysler on any of Plaintiff's claims. This court finds that a jury easily could have found in the evidence presented a basis for punitive damages under the appropriate standard of clear and convincing proof. There was evidence of conduct by Defen-

have resulted from Chrysler's misrepresenta-

dant that the jury could have reasonably deemed willful, wanton or reckless.

### 1. Negligent design

Chrysler specifically argues that Plaintiff's claim of negligent design is not a basis for punitive damages. According to Defendant, Plaintiff failed to demonstrate, clearly and convincingly, that at the time the tort was allegedly committed, Defendant was then conscious of the conduct as an invasion of Plaintiff's rights. This court disagrees. Plaintiff produced evidence showing that before the original sale of the Jimenez minivan, Chrysler was conscious of the danger of the flimsy latch with an unheaded striker that it had installed in the minivan's rear door.

First, as a general matter, punitive damages are recoverable under a negligent design cause of action. While South Carolina law does not permit the imposition of punitive damages for mere negligent conduct, (*see, e.g., Carter v. R.L. Jordan Oil Co., Inc.,* 301 S.C. 84, 390 S.E.2d 367, 368 (Ct.App.1990)), South Carolina law does permit the imposition of punitive damages if the conduct at issue is willful, wanton or reckless. *See, e.g., Scott v. Fruehauf Corp.,* 302 S.C. 364, 396 S.E.2d 354, 357 (1990). Further, the Supreme Court of South Carolina has explained that conduct is willful, wanton, or reckless if "committed in such a manner or under such circumstances that a person of ordinary reason and prudence would have been conscious of it as an invasion of the plaintiff's rights." *Taylor v. Medenica,* 324 S.C. 200, 479 S.E.2d 35, 46 (1996). Thus, "[a] conscious failure to exercise due care constitutes willfulness." *Id.* Material for purposes of imposing punitive damages in conjunction with negligence is that "the tort-feasor be conscious, or chargeable with consciousness, of his wrongdoing." *Rogers v. Florence Printing Co.,* 233 S.C. 567, 106 S.E.2d 258, 264 (1958).

tions.

Moreover, by special verdict form, the jury determined by clear and convincing evidence that Chrysler's conduct was "reckless, willful or wanton," and exhibited a "conscious failure to exercise reasonable care." The jury awarded punitive damages, therefore, based not on mere negligence, but on the egregious level of conduct that South Carolina law requires. In this case, the jury could have taken from the evidence that Chrysler's initial design of the latch, its failure to test that design, the subsequent cover-up, and Chrysler's longstanding failure to disclose the defect, while selling "safety" to its customers, were each reckless and provided sufficient support for a finding of punitive damages.

Secondly, contrary to Defendant's assertions, there was evidence presented showing that before the original sale of the Jimenez minivan, Chrysler was, at least, chargeable with consciousness of the danger associated with the flimsy latch with an unheaded striker. Chrysler minivans manufactured in model years 1984-88 are the only passenger vehicles available in the United States, since the 1960's, that fail to use a striker post with an upset head in a striker-style door latch. (Tr. 520-21, 746; Deposition of Donald Lordo, at 99-100) Emerson Krantz ("Krantz"), Chrysler's chief latch designer, testified that during the development of the minivan, Chrysler engineers advocated using a headed striker, but Chrysler's product planning department rejected the idea, ostensibly because the head of a headed striker post might "snag" items being placed inside the minivan. (Deposition of Emerson Krantz, at 167-68.)

Additionally, the evidence showed that the latch Chrysler chose to use in the rear door of its minivans did not meet the then-current federal government latch strength standards for passenger door and cargo door latches, Federal Motor Vehicle Safety Standard ("FMVSS") 206.[4] Further,

Chrysler performed no safety testing relating either to the danger of passenger ejection from the rear door or rear door latch failure. (Deposition of William Shollenberger, at 87-88; deposition of Emerson Krantz, at 48, 52-53, 326, 336, 366-67; deposition of James V. Tracy, at 129-30; Tr. 2290-91)

It is legitimately inferable from the evidence presented that Chrysler could have understood the consequences of its choice to place the headless striker in its minivan rear doors fairly soon after the minivan was introduced. The first known incident in which the rear door of a Chrysler minivan is alleged improperly to have opened, resulting in the ejection of a passenger through the rear door opening, occurred in 1985. (Deposition of LouAnn Van Der Weile, at 53-54.) Also in 1985—the year that the Jimenez minivan was manufactured—Chrysler's engineering department was ordered to and did conduct a comprehensive study on how to strengthen the rear door latch and supporting structure. Krantz, who was chief engineer at the time, prepared the drawings necessary to complete these design modifications and forwarded the design drawings to his superiors. He then heard nothing further concerning the latch modification project, even though his department had devoted over a month to the project.

Evidence was presented that, if Chrysler had acknowledged that the 1984 latch design was defective, the company would have had to recall its many minivans sold to date and would have had to stop selling its current inventory of its popular new product until the problem was remedied. (Deposition of William Randall Edwards, at 79.) Chrysler chose not to acknowledge the problem. Further, all documents related to the proposed 1985 latch redesign were destroyed by Chrysler. (Deposition of Emerson Krantz, at 112-17, 120-22, 124-25, 417-18.) The result was that the

---

**4.** The rear door latch of Chrysler's minivans escaped the direct coverage of FMVSS 206 as a result of a definitional loophole. The rear door of the minivan somehow was neither a passenger door nor a cargo door.

minivans manufactured in 1985, like that of Plaintiff, contained a headless striker as a part of the latch mechanism and a trunk-quality, as opposed to passenger car door or cargo door quality latch.

Further, there was evidence establishing that Chrysler's failure to remedy the rear door latch problem continued after the Jimenez vehicle was manufactured. The evidence showed that sometime around January 1988, without any public statement, Chrysler began using a striker post with an upset head in the rear door latches of its mid-year 1988 and later models. (Tr.2510) Chrysler instituted this modification as a "running change," replacing parts on the assembly line in mid–1988 rather than waiting for the next model year when it normally implemented ordinary design changes. Chrysler's designated corporate witness on this design change issue testified under oath, however, that (1) Chrysler did not know why the change was made, (2) no documents exist regarding the change, and (3) no Chrysler employees could recall why the change was implemented. (Deposition of Jerome Mitchell, Jr., at 15–16, 20, 27, 29–30, 63, 65–66, 126–30, 147, 151, 155; Plaintiff's exhibit 142.)

The evidence revealed Chrysler did conduct some crash testing of its minivans in the 1982–83 pre-production time period. These tests, however, did not test the rear door latch, but rather were designed to ensure that the minivan satisfied federal fuel tank integrity standards. Under a Chrysler's internal procedure, all crash tests are filmed, detailed written and computer reports are prepared by Chrysler test engineers, and the films and reports are stored for future reference. Such films and reports capture and document everything that occurs, including parts failures during such tests, not just facts relating specifically to fuel tank integrity. However, curiously, on October 19, 1988—the same year that Chrysler added headed strikers to new minivans, and while there were at least three minivan rear door ejection claims pending in litigation against Chrysler (Plaintiff's exhibit 57A; *see also* Deposition of LouAnn Van Der Weile, at 37–38, 112–14)—Chrysler shredded and burned all videotapes and written reports of crash tests involving left side impacts (like the incident here),[5] and purged all computer codes showing component failures in those tests. (Deposition of William Shollenberger, at 238–40, 253–54, 265–66; deposition of Mark W. Crossman, at 85–86.) While Chrysler argued that this was a routine purge, the jury could have easily drawn other conclusions.[6]

In April 1990, Chrysler received a letter from the National Highway Traffic Safety Administration ("NHTSA") in which NHTSA told Chrysler that its data showed that minivan rear doors were about four times more likely to open in an accident than were the front doors. (Plaintiff's exhibit 39.) At that same time, the evidence showed that Chrysler was on notice of at least seven separate cases of alleged minivan liftgate openings, resulting in injuries or death. (Plaintiff's exhibit 57A.) Soon thereafter, an internal Chrysler engineering study revealed that the rear door latches in Chrysler minivans were significantly weaker than the rear door latches in the minivans of Chrysler's domestic competitors. (Plaintiff's exhibit 129.)

In July 1990, there were at least ten claims against Chrysler involving deaths or serious injuries that were attributed to

---

5. The evidence showed that most Chrysler minivan rear door ejections result from left side impacts. (Plaintiff's exhibit 140.)

6. Especially given the fact that Chrysler had a document retention policy which specifically bars destruction of any test results while a lawsuit involving that vehicle is pending. (Deposition of William Shollenberger, at 266–67.) Further, results of frontal collision tests, in which the rear door should not and did not open, were not destroyed. Presently, Chrysler's files contain complete videotapes, written reports, and computer inputs for frontal tests, including tests done years before, months before, and days after the two separate sets of left-side crash tests that were singled out for destruction. (*Id.* at 249–52.)

rear door ejections from minivans about which Chrysler was aware. (Plaintiff's exhibit 57A.) In that same month, Henry Cook ("Cook") of Chrysler's engineering department wrote a memorandum to John Nemeth, then general manager of Chrysler's minivan platform, acknowledging the fact that Chrysler's rear door latch failed to meet Ford, GM, or FMVSS 206 performance specifications. (Deposition of Henry George Cook, at 61–63; deposition of Ronald Blazic, at 88–89; Plaintiff's exhibit 8.) Cook stated in his memorandum that production of a latch meeting FMVSS 206 would take thirty-two weeks to implement and would result in a piece cost penalty of approximately 25¢ to 50¢ per latch and a tooling cost, covering parts suppliers, of approximately $125,000. (Plaintiff's exhibit 8.) Despite these findings, Cook recommended that Chrysler avoid improving the latch, because correcting the latch would undercut the position Chrysler was taking in response to NHTSA's 1990 inquiry.[7]

Even after the initial inquiry by NHTSA, the evidence showed that Chrysler continued to disregard or dispute information establishing the defective nature and problems with its minivans' rear door latch, and also continued to refuse to correct the problem. Evidence was presented at trial showing that in 1992, for example, a Chrysler's "liftgate latch work team" concluded that Chrysler's latch was conspicuously weak, especially compared to the latches of its competitors. (Tr. 1474–75) Not only did Chrysler refuse to take any action, it took the affirmative step of directing its employees not to write anything down about the latch. (Tr. 1480–81)

In January 1993, at a time when at least twenty-one claims were pending against

Chrysler involving alleged rear door openings and ejections (Plaintiff's exhibit 57A), Chrysler formed a minivan "Safety Leadership Team," with Paul Sheridan ("Sheridan") serving as chairman. (Tr.1465) While Chrysler strongly disputed his testimony, Sheridan testified at trial that, on one occasion, he was ordered to pick up and destroy minutes of a Safety Leadership Team meeting where the subject of the latch and other problems were discussed. (Tr. 1484–85.) Sheridan testified further, again without rebuttal by Chrysler, that, in approximately February 1993, Chrysler's latch problems interfered with its own internal tests of components on the minivan. For instance, Chrysler test managers duct-taped the rear doors shut before Chrysler bumper tests because, otherwise, the rear doors opened on impact. Sheridan testified that in reviewing these tests Chrysler personnel joked that Chrysler had to use duct tape to keep the test equipment from being ejected out of the rear of the minivan "but we didn't have a latch adequate enough to keep [people] from falling out of the back." (Tr.1480) In April 1993, Chrysler management rejected yet another proposal by Chrysler's minivan Safety Leadership Team to improve the latch. Sheridan testified that a Chrysler official told him that if Chrysler changed the latch at that point it "would indict everything we have done in the field." (Tr.1535)

After a 1993 collision in Fairfax, Virginia, involving a liftgate opening and fatal ejection, NHTSA commenced a formal investigation of Chrysler's minivan rear door latch. In February 1994, immediately prior to the accident involved in this case, Chrysler knew about more than thirty claims involving alleged rear door open-

---

**7.** There was also evidence presented showing that in 1990, NHTSA was considering extending FMVSS 206 to minivan rear doors and it consulted Chrysler and other manufacturers regarding their experience with rear latch performance. Chrysler opposed the extension of FMVSS 206, although it never included the Cook memorandum or any underlying data in its response to NHTSA's inquiries.

Nor did Chrysler report information concerning lawsuits that it was contesting which alleged rear liftgate latch failures and ejections. When NHTSA revisited the issue in 1995–96, after many more documented openings, it chose to extend FMVSS 206 to minivans over Chrysler's continued opposition. (Tr. 2278; Plaintiff's exhibit 91)

ings, ejections and injuries or death. (Plaintiff's exhibit 57A.) Although on notice that its latch design was defective, Chrysler did not cure the defect nor even warn its customers of the danger. Sheridan testified that he was told instead "that ship has sailed. We told you that last time, next subject." (Tr.1539)

On November 17, 1994, after the accident at issue in this case, NHTSA provided senior Chrysler executives with a preview of the report that it intended to make public in connection with its investigation of Chrysler latches. NHTSA's initial draft report documented a series of crash tests showing that the Chrysler minivan rear door latch failed just as it had in the Jimenez accident, by sliding "up and over" the unheaded striker, causing crash test dummies to fly over the rear seat and through the open rear door. (Plaintiff's exhibits 33 and 140.) At that same November 17, 1994 meeting, NHTSA officials showed Chrysler's representatives overhead slides, later memorialized in a document entitled "Chrysler Minivan Liftgate Latch Failure—Investigation Review." On the last page of that document, under the heading "Conclusions," NHTSA told Chrysler: "The latch failure is a safety defect that involves children." (Plaintiff's exhibit 36.)

Evidence was presented showing that Chrysler did not agree with NHTSA's findings and instead of notifying consumers of the safety defect and taking some corrective action in response, Chrysler intensified its efforts to minimize and conceal the problem. In this regard, Chrysler's Vice Chairman, Tom Dennome ("Dennome"), persuaded *The Detroit News* not to print a story scheduled for publication concerning the latch. (Plaintiff's exhibit 274; *see also*, Deposition of Robert Eaton, at 82–83.) Dennome also wrote to Robert Eaton ("Eaton"), Chrysler's Chief Executive Officer, in a "Confidential and Privileged" memorandum that, "[i]f we want to use political pressure to try to squash a recall letter, we need to go now." (Plaintiff's exhibit 274.)

Although Eaton denied at trial that Chrysler ever held settlement discussions with NHTSA (Deposition of Robert Eaton, at 85), or that Chrysler had believed that NHTSA would find a defect, Jimenez introduced documents at trial showing that Chrysler was discussing "settlement" with NHTSA (Plaintiff's exhibit 271) and showing that Chrysler rated the chances of NHTSA dropping the defect issue at "zero." (Plaintiff's exhibit 323) While Eaton also denied that NHTSA had "insisted" that Chrysler replace latches with stronger, safer ones, Mr. Jimenez introduced a document that Chrysler had received a letter from NHTSA that said just that. (Plaintiff's exhibit 35)

Chrysler did not end up having to recall its minivans to fix the latch, but was instead allowed by NHTSA to conduct a voluntary service action to replace the defective liftgate latches. In nationwide advertising informing consumers of the service action, however, Chrysler suggested that the service action was not due to a problem with the latch. Chrysler's "1–800 MINIVAN" hotline, ostensibly set up to answer consumer questions regarding the minivan and facilitate expeditious completion of the service action, similarly used a script that sought to downplay the latch problem. (Plaintiff's exhibits 35, 48 and 322.) Only after pressure from NHTSA did Chrysler alter its misleading message to consumers. (Plaintiff's exhibits 35 and 48.)

The message from the highest echelons of Chrysler management, however, never has changed. Notwithstanding all of the evidence described above, Eaton testified under oath that he has no hesitation stating that the latch is not defective and that NHTSA never concluded otherwise. (Deposition of Robert Eaton, at 69–70, 90.) Eaton gave these same assurances to consumers regarding the critical issue of the safety of their vehicles, even though he, a highly-experienced automotive engineer:

(1) never looked at the latch (Deposition of Robert Eaton, at 40, 134); (2) did not know an unheaded striker existed in the latch until the day of his deposition (Deposition of Robert Eaton, at 20–21); (3) did not know or, according to him, care how Chrysler's latch compared to the strength of all of the competitors' latches or to FMVSS 206 (Deposition of Robert Eaton, at 31–35, 67); (4) never saw (except on television) any actual NHTSA crash tests related to Chrysler minivans (Deposition of Robert Eaton, at 134–35); (5) never read the NHTSA conclusions that the latch is a safety defect that involves children (Deposition of Robert Eaton, at 78–79, 85)[8]; and (6) after receiving a letter from a man whose son, while still strapped in his seat, had been ejected from a minivan, did nothing to investigate why the latch had opened in the accident, and said simply that accidents happen and people get hurt (Deposition of Robert Eaton, at 55–56).

From this lengthy recitation of facts with all legitimate inferences in Plaintiff's favor, it is clear that there was evidence from which a reasonable jury could have found that Chrysler acted recklessly when it designed the minivan rear door latch in 1984. Moreover, Chrysler's conduct during 1985—the year the Jimenez vehicle was manufactured and the year of the first known ejection from the rear of a Chrysler minivan—further buttresses this conclusion. Additionally, Chrysler's post-design conduct also supports the jury's imposition of punitive damages.

Chrysler asserts, however, that the punitive damages award cannot rest upon post design conduct because post-design conduct cannot prove that Chrysler was conscious of a failure to exercise due care at the time it designed the latch. This court does not agree. To begin with, this court has just set forth the evidence that the jury could reasonably have relied upon to determine that Chrysler was reckless in 1984 and before when it initially designed and failed to test the rear door latch of the minivan. Further, flagrant post-marketing misbehavior long has been viewed as one of the basic grounds for assessing punitive damages against manufacturers for defective products. *See generally* David G. Owen, Punitive Damages in Product Liability Litigation, 74 Mich. L.Rev. 1257, 1352–61, 1371 (1976) (if "manufacturers actually aware of serious product hazards refuse to adopt feasible and inexpensive corrective measures plainly called for in light of the substantial risk," they behave in a manner that reflects a flagrant indifference to the public safety that should be punished and deterred).[9] In this case, there was evidence from which a reasonable jury could have determined that Chrysler had subsequent knowledge of problems with the latch and was unwilling to correct the design defect or notify consumers of the situation. The evidence presented by Plaintiff could reasonably have been viewed by the jury as showing conscious efforts to conceal the problem. That post-design conduct, impliedly intended to preserve profits (even a 10% drop in sales in one year would have cost the company, on average, approxi-

---

8. Record evidence showed that NHTSA concluded its investigation by stating that approximately 37 people may have been killed and 98 people seriously injured as a result of Chrysler minivan latch failures. (Plaintiff's exhibit 193)

9. Even *Mosser v. Fruehauf Corp.*, 940 F.2d 77 (4th Cir.1991), cited by Chrysler implies that punitive damages may be appropriate if the defendant-manufacturer knew of the product defect, but took no corrective measures to eliminate it. In *Mosser*, the defendant had no knowledge of any dangers posed by its product before the plaintiff's injury and that court distinguished such a situation from the situation "where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or making adequate disclosure and warning of such danger." *Id.* at 85 (citations omitted).

mately $150 million) and to avoid the cost of a recall (at least $115 million), provides an additional sufficient ground for awarding punitive damages.

### 2. Negligent Misrepresentation

 Chrysler also argues that punitive damages were unrecoverable under Plaintiff's negligent misrepresentation cause of action. However, this court finds that it is well-settled that a claim of negligent misrepresentation can support an award of punitive damages if the defendant's conduct is sufficiently egregious. See Scott v. Fruehauf Corp., 302 S.C. 364, 396 S.E.2d 354, 357 (1990) (stating that punitive damages can be recovered in negligence suits if negligence is sufficiently egregious); Lengel v. Tom Jenkins Realty, Inc., 286 S.C. 515, 334 S.E.2d 834, 837 (Ct.App.1985) (holding that a plaintiff can recover punitive damages in a negligent misrepresentation claim if the defendant's conduct is sufficiently egregious). As with the negligent design claim, this Court finds that viewing the facts with all legitimate inferences in Plaintiff's favor, the jury could reasonably find clear and convincing evidence to support the award of punitive damages for the negligent misrepresentation claim.

Jimenez offered advertisements portraying the minivan with the defective liftgate latch as safe. See, e.g., Plaintiff's exhibits 237, 239 and 242. Eaton testified that all Chrysler minivans expressly were held out to the public with "promises of safety," because representing the minivan as safe was "critical" to its "image." Eaton testified further that consumers absolutely have a right to expect safe minivans. There was evidence presented, from which the jury could infer that, well before Sergio's death, Chrysler was fully aware of the defect in its minivan latches and actually covered it up. In addition, Elwell testified that Chrysler had a duty to inform customers that the minivan was defective. Chrysler's silence in the face of clear knowledge and understanding of the

defect and destruction of materials potentially documenting its culpability could easily have been deemed by the jury to demonstrate Chrysler's knowledge of information that it consciously failed to impart. Such conduct operates as an affirmative misrepresentation or fraud. Such evidence constituted clear and convincing evidence sufficient to support an award of punitive damages.

Chrysler's reliance on Saval v. BL Ltd., 710 F.2d 1027 (4th Cir.1983) (per curiam), in this regard, is misplaced. In Saval, plaintiffs who purchased automobiles sought punitive damages under Maryland law because the automobiles failed to operate as warranted. Id. at 1033–34. The Fourth Circuit concluded that the plaintiffs were not entitled to punitive damages because their case properly was characterized as "a breach of warranty case with, perhaps fraudulent overtones." Id. at 1034 Importantly, the court noted that the plaintiffs had not suffered "personal injuries arising from products defects," which generally is the predicate for awarding punitive damages for defective products. Id. According to the court, the automobiles failed to "live up to their expectations or the [defendant's] boasts" and were not "patent lies" that could support an award of punitive damages. Id.

Unlike Saval, this is not a breach of warranty case, but a tort case. Also, unlike Saval, the defective product here caused a death. According to Saval, the existence of personal injury is what distinguishes cases in which punitive damages are appropriate. Id. Finally, there was evidence presented in support of Plaintiff's contention that Chrysler engaged in "patent lies," not mere boasts, in that the jury could have determined from the evidence presented that Chrysler consciously placed a defective product containing a known defect in the stream of commerce, misrepresented that product as safe, and concealed for years its knowledge of the defect.

Accordingly, this Court holds that Chrysler is not entitled to judgment as a matter of law.

## III. DEFENDANT'S RULE 59 MOTION FOR NEW TRIAL

Defendant alternatively makes a motion for new trial based upon certain "substantial errors" in the admission or rejection of evidence which affect Chrysler's substantial rights and based upon the argument that the jury's award of damages was the result of passion and prejudice. Alternatively, Chrysler argues for remittitur.

### A. Standard for New Trial under Rule 59

■ On a motion for a new trial under Rule 59(a), FRCP, however, it is the duty of the judge to set aside the verdict, and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence, is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. *Gill v. Rollins Protective Servs., Co.,* 836 F.2d 194, 196 (4th Cir.1987).

■ A remittitur, used in connection with Rule 59(a), is the established method by which a trial judge can review a jury award for excessiveness. *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587 (4th Cir.1996). In a remittitur the court orders a new trial unless the plaintiff accepts a reduction of an excessive jury award. *Id.* If a court finds a jury award excessive, it is the court's duty to require a remittitur or order a new trial. *Id.,citing Linn v. United Plant Guard Wkrs., Local 114,* 383 U.S. 53, 65–66, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

### B. Errors in the Admission or Rejection of Evidence

Chrysler argues that its substantial rights were affected by this court's admission and or rejection of certain specific evidence in this case. Specifically, Chrysler points to rulings of the court regarding the 1) exclusion of evidence concerning the underlying accident 2) admission of evidence regarding the strength of certain liftgate latches, and, 3) admission of evidence of post-accident conduct by Chrysler and the National Highway Traffic and Safety Administration.

#### 1. Evidence concerning the underlying accident

■ Chrysler challenges this court's evidentiary rulings disallowing evidence of fault and seatbelt usage in the underlying accident. Chrysler argues that by preventing it from introducing evidence that Ms. Barrientos may have been at fault in the accident, that Chrysler was also prevented from proving Ms. Barrientos comparatively liable for Sergio's death under Plaintiff's negligent design and negligent misrepresentation claims. This court finds that the evidence of fault in the underlying accident was properly excluded. Further, to the extent that Chrysler now also proffers Barrientos's alleged negligence as relevant to damages issues, such as emotional distress, why the family dissolved, and the like, Chrysler never proffered relevance on that basis before. The argument therefore is waived.

Ms. Barrientos allegedly failed to obey a traffic signal. Because Plaintiff's claims focus on the crashworthiness of the minivan, any alleged negligence on Ms. Barrientos's part is irrelevant and properly excluded. Additionally, the Court finds that the potential for prejudice and confusion if that evidence had been introduced would have outweighed its probative value.

■ This issue turns on an interpretation of South Carolina law. South Carolina is at the forefront of imposing liability on defectively designed automobiles that exacerbate injury because of a design defect. Indeed, South Carolina was one of the very first states to adopt the crashworthiness doctrine. *See Mickle v. Blackmon,* 252 S.C. 202, 166 S.E.2d 173, 187 (1969).

Since *Mickle,* many other courts have adopted the crashworthiness doctrine. *See, e.g., Andrews v. Harley Davidson, Inc.,* 106 Nev. 533, 796 P.2d 1092, 1095 (1990); *Ford Motor Co. v. Hill,* 404 So.2d 1049, 1052 (Fla.1981); *Leichtamer v. American Motors Corp.,* 67 Ohio St.2d 456, 424 N.E.2d 568, 577 (1981); *Ford Motor Co. v. Stubblefield,* 171 Ga.App. 331, 319 S.E.2d 470, 477 (1984). The crashworthiness doctrine imposes liability on automobile manufacturers for design defects that enhance, rather than cause, injuries. *See Mickle,* 166 S.E.2d at 187–88. The doctrine applies if a design defect, not causally connected to the collision, results in injuries greater than those that would have resulted were there no design defect. *See id.* The issue for purposes of a crashworthiness case, therefore, is enhancement of injuries, not the precipitating cause of the collision.

In *Binakonsky v. Ford Motor Co.,* 133 F.3d 281, 287 (4th Cir.1998), the Fourth Circuit applied the crashworthiness doctrine to conclude that an automobile driver's intoxication was irrelevant for purposes of determining liability in the context of an allegedly defective fuel tank system that enhanced his injuries but did not cause the collision. As the court explained, a driver's negligence does not absolve an automobile manufacturer of the duty "to reduce the risk of 'secondary impact injuries.'" *Id.* at 288, *quoting Frericks v. General Motors Corp.,* 274 Md. 288, 336 A.2d 118, 127 (1975). Applying Maryland law, the Fourth Circuit therefore has recognized, in at least one context, that a driver's fault in operating an automobile cannot be held against him under the crashworthiness doctrine.

The question of contributory negligence as a defense to a negligence claim pertaining to crashworthiness, however, was not before the Fourth Circuit in *Binakonsky,* because the plaintiff did not contest the point below. Moreover, the case was governed by Maryland law, which differs in material respects from South Carolina law. First, Maryland, unlike South Carolina, is a contributory negligence, rather than comparative negligence, jurisdiction. While the concept of "enhanced injuries" adequately addresses the respective responsibilities of the parties in a comparative negligence jurisdiction, it works less well in an all-or-nothing contributory negligence jurisdiction. Second, in Maryland, unlike in South Carolina, a plaintiff has no need to press negligence claims in the crashworthiness setting, because he can get full relief, including punitive damages, under a strict liability claim. *Owens–Illinois Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633, 655 (1992). The presence of such a framework for recovery in Maryland ensures keeping the responsibility on the manufacturer for failing to design a crashworthy vehicle. As this Court interprets the law; in South Carolina, the same ultimate result is obtained by the conclusion that comparative negligence in causing an accident is not a defense to a negligence claim pertaining to crashworthiness.

It follows that Ms. Barrientos's alleged negligence should not operate against the Jimenez family. *See Reed v. Chrysler Corp.,* 494 N.W.2d 224, 226 (Iowa 1992); *Andrews v. Harley Davidson, Inc.,* 106 Nev. 533, 796 P.2d 1092, 1095–96 (1990). Given that the crashworthiness doctrine entails liability for enhanced injuries because of design defect, in such a case, a collision is presumed. The *Mickle* court established this principle in South Carolina law some time ago:

> It is a matter of common knowledge that a high incidence of injury-producing motor vehicle collisions is a dread concomitant of travel upon our streets and highways, and that a significant proportion of all automobiles produced are involved in such smashups at sometime [sic] during their use. Thus, an automobile manufacturer knows with certainty that many users of his product will be involved in collisions, and that the incidence and extent of injury to them will

frequently be determined by the placement, design and construction of such interior components as shafts, levers, knobs, handles and others. By ordinary negligence standards, a known risk of harm raises a duty of commensurate care. We perceive no reason in logic or law why an automobile manufacturer should be exempt from this duty.

166 S.E.2d at 185. *See also Larsen v. General Motors Corp.*, 391 F.2d 495, 502 (8th Cir.1968); *Reed*, 494 N.W.2d at 230.

Distilling these precepts, the relevant issue is that Chrysler is charged with foreseeing [10] that the minivan would be involved in a traffic accident and that a defective rear door latch could exacerbate an injury—or cause a death—regardless of any conduct by a driver or a passenger of the minivan. Under this rubric, any alleged negligence by Barrientos is remote—and thus irrelevant—and hence properly excluded.

It should be noted that, applying this same rule, several courts have concluded that any form of fault or negligence by a driver or passenger of an automobile is immaterial under the crashworthiness doctrine. *See, e.g., Volkswagen of Am., Inc. v. Marinelli*, 628 So.2d 378, 385 (Ala.1993); *Reed*, 494 N.W.2d at 229–30; *Andrews*, 796 P.2d at 1095–96. As the *Reed* court explained:

The [crashworthiness] theory, which presupposes the occurrence of accidents precipitated for myriad reasons, focuses alone on the enhancement of resulting injuries. The [theory] does not pretend that the design defect had anything to do with causing the accident. It is enough if the design defect increased the damages. So any participation by the plaintiff in bringing the accident about is quite beside the point.

*Reed*, 494 N.W.2d at 230.

Therefore, while there is a divergence of opinion on the issue, the better-reasoned rule is to exclude any evidence relating to Ms. Barrientos's alleged negligence. First of all, such a rule intrinsically dovetails with the crashworthiness doctrine: Because a collision is presumed, and enhanced injury is foreseeable as a result of the design defect, the triggering factor of the accident is simply irrelevant. Secondly, the concept of "enhanced injury" effectively apportions fault and damages on a comparative basis; defendant is liable only for the increased injury caused by its own conduct, not for the injury resulting from the crash itself. Further, the alleged negligence causing the collision is legally remote from, and thus not the legal cause of, the enhanced injury caused by a defective part that was supposed to be designed to protect in case of a collision. [11]

Chrysler's claim that evidence of contributory fault should have been allowed with respect to its negligent misrepresentation claim also is without merit. First, Chrysler never argued that the evidence it was offering, if excludable in a crashworthiness case, nevertheless was relevant to support a defense to a negligent misrepresentation claim. The Court must be apprized of the grounds on which evidence is sought to be introduced in order for it to make an appropriate ruling. Chryslers argument in this regard, not having been raised earlier, now is waived. Moreover, since the gravamen of Plaintiff's claim was that Chrysler touted safety while concealing a known defect in the car, any alleged negligence by Ms. Barrientos in connection with the operation of the vehicle is too remote, for proximate cause purposes, to be a defense to the negligent misrepresentation claim. The court holds, therefore, that evidence of any alleged fault by Ms. Barrientos regarding her alleged failure to obey a traffic signal properly was exclud-

---

10. In this case, of course, the evidence revealed that Chrysler actually knew that the defective latch was causing many injuries and deaths.

11. Comparative negligence related to the door itself—tying it shut for example—could still be a defense, if a factual basis existed, which is not the case here.

ed. Consequently, Chrysler is not entitled to a new trial on this ground.

Chrysler also argues that this Court erred in limiting the evidence concerning seatbelt use in the underlying accident. This court limited evidence regarding seatbelts to the fact that the minivan was equipped with them. (See this court's September 9, 1997 order on motions in limine at p. 6) Chrysler argues that the ruling precluded evidence that was relevant to 1) the determination of whether the minivan was unreasonably dangerous / crashworthiness, 2) legal causation, and 3) damages. Respecting crashworthiness, Chrysler contends that the jury may have speculated that Sergio was thrown from the minivan despite his wearing a seatbelt. As to causation, Chrysler asserts that the evidence was necessary to show that Chrysler could not be liable for Sergio's death because had he been wearing a seatbelt, Sergio would not have been thrown from the minivan. With regard to damages, Chrysler argues that had Sergio been wearing a seatbelt, he would not have died and that punitive damages are not appropriate in such circumstances.

Plaintiff agreed that evidence demonstrating that the minivan was equipped with seatbelts was admissible. According to Mr. Jimenez, however, under South Carolina law, absent a statutory duty to wear a seatbelt, failure to wear seatbelts may not be introduced to establish fault or pre-injury avoidable consequences.[12] This court agrees.

In ruling on the pre-trial motion to limit evidence of seatbelt use, this Court relied on *Keaton v. Pearson*, 292 S.C. 579, 358 S.E.2d 141 (S.C.1987), to conclude that the only relevant evidence of seatbelts in this litigation was that the minivan was equipped with seatbelts. In *Keaton*, the Supreme Court of South Carolina unequivocally held that "[i]n the absence of an affirmative statutory duty, a plaintiff's fail-ure to use a seatbelt does not constitute contributory negligence or pre-injury failure to minimize damages." *Id.* at 141.

Chrysler argues that *Keaton* does not limit evidence of seatbelt use relevant to other uses such as legal causation and the determination of unreasonably dangerous. While *Keaton* may not definitively resolve the precise issue presented here, several jurisdictions have rejected the cramped interpretation of seatbelt gag statutes offered by Chrysler. *See, e.g., Dillinger v. Caterpillar, Inc.*, 959 F.2d 430, 437–40 (3d Cir.1992) (holding under Pennsylvania law that plaintiff's non-use of a seatbelt was inadmissible for purposes of liability or minimizing damages in products liability action); *Horn v. General Motors Corp.*, 17 Cal.3d 359, 131 Cal.Rptr. 78, 551 P.2d 398, 404 (1976) (en banc) (holding that the plaintiff's failure to wear a seatbelt could not be introduced by the defendant for purposes of proving that the plaintiff was negligent or that the defendant's conduct was not the proximate cause of the plaintiff's injury); *McCord v. Green*, 362 A.2d 720, 722–23 (D.C.Ct.App.1976) (holding improper an instruction that non-use of seatbelt constitutes negligence by plaintiff); *Florida Power & Light Co. v. Macias by Macias*, 507 So.2d 1113, 1116–17 (Fla.3d Dist.Ct.App.1987) (ruling that a child's non-use of seatbelt could not be introduced by the defendant as to causation because seatbelts were not a contributing factor to the accident); *State v. Ingram*, 427 N.E.2d 444, 448 (Ind.1981) (holding that non-use of a seatbelt is inadmissible as to minimizing damages); *Olson v. Ford Motor Co.*, 558 N.W.2d 491, 494 (Minn.1997) (concluding that no evidence of plaintiff's failure to use a seatbelt may be introduced for any reason); *Hagwood v. Odom*, 88 N.C.App. 513, 364 S.E.2d 190, 192 (1988) (holding that evidence of a plaintiff's failure to use a seatbelt could not be introduced against him for purposes of liability or limiting

---

**12.** The parties do not dispute that South Carolina law statutorily precludes introduction of seatbelt use in an attempt to establish negli-gence or contributory negligence. *See* S.C.Code Ann. § 56–5–6540 (Law.Co-op.1976).

damages); *Vogel v. Wells,* 57 Ohio St.3d 91, 566 N.E.2d 154, 158–59 (1991) (ruling that evidence of non-use of a seatbelt is inadmissible as to liability and damages); *Wright v. Hanley,* 182 W.Va. 334, 387 S.E.2d 801, 803–04 (1989) (opining that instruction based on non-use of a seatbelt is improper for purposes of comparative fault). This Court concludes that South Carolina law would follow the reasoning and holdings of these courts that evidence of seatbelt usage is inadmissible respecting crashworthiness, causation, and punitive damages.

This court disagrees that *Hinkamp v. American Motors Corp.,* 735 F.Supp. 176 (E.D.N.C.1989), *aff'd,* 900 F.2d 252 (4th Cir.1990) (unpublished) (per curiam), a case argued by Chrysler, is authority for admitting evidence of seatbelt non-use under South Carolina law. *Hinkamp* did not involve a seat belt issue. Moreover, it was decided under the law of North Carolina, which, in contrast to South Carolina, has been resistant even to recognizing a crashworthiness cause of action. *Id.* at 177. In fact, under North Carolina law, a plaintiff's contributory negligence will bar him from recovery if he contributes to just one of the proximate causes of his injury. *See id.* at 178, *citing Badders v. Lassiter,* 240 N.C. 413, 82 S.E.2d 357 (1954)). South Carolina does not observe this harsh rule, but provides instead for comparative negligence. Finally, this court notes that *Hinkamp* does not appear correctly to reflect North Carolina law on the seatbelt issue. In *Hagwood v. Odom,* 88 N.C.App. 513, 364 S.E.2d 190, 191–92 (1988), the North Carolina Court of Appeals held that a plaintiff's failure to wear a seatbelt could not be introduced against him for purposes of liability or avoidable consequences as to damages. These distinctions render *Hinkamp* inapposite.

Chrysler's concern that the jury may have speculated that Sergio was belted at the time of the collision and that the seatbelt failed is paradoxical. Chrysler objected during Plaintiff's opening statement when Plaintiff's counsel told the jury that Sergio's sister "saw that he was clipped in." Plaintiffs counsel explained at side bar that he also intended to tell the jury that Sergio was not belted at the time of the collision, but Chrysler objected to any further comment at all. (Tr. 52–53, 57, 67, 69–70, 74–75, 79–80) This Court issued curative instructions which operated to remedy any possible impropriety. *See United States v. Morsley,* 64 F.3d 907, 913 (4th Cir.1995), *cert. denied,* 516 U.S. 1065, 116 S.Ct. 749, 133 L.Ed.2d 697 (1996) (holding that a district court's curative instructions to the jury with respect to a prosecutor's statements cured any possible prejudice of a criminal defendant's constitutional rights). Further, as the evidence was presented, the clear implication before the jury throughout the trial was that Sergio had not been belted at the time of the accident.

Finally, regardless of the above, Chrysler could not rely upon its use of seatbelts in the design of its minivan to excuse the fact that the rear door latch was not crashworthy. It was undisputed at trial that, at the time the minivan was designed, Chrysler knew that only 12% of Americans utilized seatbelts, and even today only approximately 50% do. *See* Plaintiff's exhibit 86; Deposition of Emerson Krantz, 144–45, 525, 528–29. In South Carolina, for example, passengers are not even required to utilize seatbelts in rear seats that do not have shoulder harnesses, as is the case in the minivan at issue. Because lack of seatbelt use was well known to Chrysler, this Court finds, as a matter of law, that Chrysler had some duty to take into account lack of seatbelt use in its design. It was undisputed at trial that the door latch mechanisms are part of the crashworthiness design of the car and are integral to the overall scheme to retain passengers in the vehicle in the event of an accident.

In light of the undisputed facts in the record and for all of the above reasons, lack of seatbelt use is legally irrelevant. This ruling is entirely consistent with the

South Carolina Supreme Court's ruling in *Keaton,* which expressly precludes lack of seatbelt use as evidence of contributory negligence or of a "pre-injury failure to minimize damages." *Keaton,* 292 S.C. 579, 358 S.E.2d 141 (1987). This Court also reaffirms its earlier holding that the only evidence admissible with respect to seatbelt usage is that the minivan was equipped with seatbelts.

Finally, to the extent Chrysler now posits that seat belt or traffic light issues are relevant to issues pertaining to mental anguish, reasons for the family dissolution and the like, such arguments are waived, having not been offered as grounds of relevance during *in limine* arguments or when the evidence was proffered.

### 2. Evidence regarding the strength of liftgate latches

Chrysler's next assertion is that the Court improperly admitted evidence on the strength of the liftgate latch. According to Chrysler, because Plaintiff's theory of the suit principally hinged on the latch strikers lacking a head, any evidence not related to the fact that the striker had no head should have been excluded. In response, Plaintiff urges that this is a case of a defectively designed latch, which includes all the relevant components, not single, discrete defects. Mr. Jimenez argues further that the overall weakness of the latch contributed to the bypass that caused the door to open and, moreover, that latch strength was more generally relevant to the jury's understanding of Chrysler's actions related to the latch.

As this Court has held repeatedly on this point over the course of these proceedings, Mr. Jimenez is more persuasive. At issue is a defective latch, not a defective part of a latch. The striker post was treated by NHTSA in its investigation as being an integral part of the defective latch, and not a separate unit. Significantly, when Chrysler ultimately was forced to undertake a service action to replace the defective latch, the notice that it sent to owners of minivans that had headless strikers never even mentioned the existence of a headless striker; rather, the notice promised that a "stronger latch" would be supplied—the stronger latch contained a headed striker, as well as other strength enhancements. *See* Plaintiff's exhibit 124.

Chrysler improperly attempts to segment the defects of the latch. What Mr. Jimenez demonstrated at trial was that Chrysler's decision not to put a passenger door-quality latch in the rear door of its family minivans led to a latch that was defective in numerous respects including, but not limited to, the headless striker. The headless striker rendered the latch grossly defective with respect to vertical load retention—its vertical load retention effectively was "zero," whereas a passenger car door is required to have vertical load retention of 2,500 pounds. *See. e.g.,* Plaintiff's exhibit 8. The evidence also showed that the latch was substantially weaker in all directions than passenger door latches.

In addition, one of Plaintiff's witnesses, Wayne McCracken, testified how the defects combined in the context of the accident. The weak latch bent at impact, causing a ramping effect that promoted the latch pawl proceeding vertically up the striker post and passing over the top of the headless post. (Tr. 484) That alone justifies the latch strength evidence, but there were substantial additional grounds on which latch strength was relevant as well.

Most of Chrysler's actions properly can be seen only in the context of the overall defectiveness of the latch. The evidence reflected that before the fatal collision in this case Chrysler knew that it had a defective latch in the minivans it had built. The concept of latch strength, while directly relevant to the accident in question, also is highly relevant to explaining Chrysler's actions, which were part of Jimenez's proof of "cover-up."

For all of the foregoing reasons, Chrysler's arguments on latch strength are meritless. The evidence was highly relevant and probative on many issues. Far from confusing the jury, the evidence provided important information bearing on crashworthiness and on Chrysler's reckless, willful behavior.

### 3. Post accident conduct by Chrysler and the National Highway Traffic and Safety Administration

■ Chrysler's next argument centers on post-collision conduct. Making clear that it was introduced solely on the issue of punitive damages, the Court permitted the introduction of the following: a closing report and crash-test video produced by NHTSA detailing and documenting the defective nature of the minivan rear door latch and the danger posed by the defect, evidence of a meeting between Chrysler and NHTSA, with accompanying documents, evidence that Chrysler instituted the "1–800–MINIVAN" hotline, and the service action announcements made by Chrysler and NHTSA. Chrysler insists that this evidence is irrelevant and unfairly prejudicial. Plaintiff, however, posits that this evidence properly was admitted because it demonstrates Chrysler's motive and intent for initially marketing and continuing to market the defective latch, which evidence has a direct bearing on the issue of punitive damages.

In *Gilbert v. Duke Power Co.*, 255 S.C. 495, 179 S.E.2d 720, 723 (1971), the Supreme Court of South Carolina discussed the propriety of admitting evidence under such circumstances:

> When the recovery of exemplary damages is sought and the pleadings properly disclose circumstances which justify an allowance of such damages, any matters of evidence having a reasonable tendency to establish the existence or nonexistence of a fact or circumstance warranting the allowance of such damages may be introduced.

Governed by this rubric, "evidence of any fact which legitimately tends to show the motive and intent of the defendant in doing the act complained of is admissible— as, ... the existence ... of malice or other aggravations essential to the allowance of such damages." *Id.* The *Gilbert* court permitted the introduction of mitigating evidence for the limited purpose of establishing the propriety of punitive damages. South Carolina law, therefore, expresses a pronounced preference for admissibility of all of a defendant's conduct in a suit seeking punitive damages.

The propriety of the Court's admission of evidence regarding Chrysler's post-collision conduct is also supported by other courts. *See, e.g., Dykes v. Raymark Indus., Inc.*, 801 F.2d 810, 818 (6th Cir.1986) *cert. denied* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987) (affirming admission of post-injury documentary evidence for purposes of establishing that the defendant suppressed information regarding the dangers of asbestos); *Hilliard v. A.H. Robins Co.*, 148 Cal.App.3d 374, 196 Cal. Rptr. 117, 133 (1983) (concluding that evidence of post-injury conduct should have been admitted into evidence because it tended to prove that the defendant acted willfully); *Coale v. Dow Chem. Co.*, 701 P.2d 885, 890 (Colo.App.1985) (explaining that evidence of post-injury conduct was admissible for purposes of showing that the defendant acted wantonly in connection with a claim of punitive damages); *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 204 (Colo.1984) (observing that post-injury conduct is relevant for purposes of determining punitive damages); *Gonzales v. Acadiana Fast Foods, Inc.*, 670 So.2d 457, 458, 460 (La.Ct.App.1996), *writ denied*, 671 So.2d 920 (La.1996) (noting that it had instructed the trial court to admit evidence of the defendant's post-accident conduct); *Kociemba v. G.D. Searle & Co.*, 707 F.Supp. 1517, 1536 (D.Minn.1989) (same); *Stinson v. E.I. DuPont De Nemours & Co.*, 904 S.W.2d 428, 432–33 (Mo.Ct.App. 1995) (holding that the trial court erred in excluding post-accident conduct in a strict

liability suit and reversing the judgment to permit introduction of such evidence); *Gonzales v. Surgidev Corp.,* 120 N.M. 133, 899 P.2d 576, 584 (1995) (ruling that post-injury evidence was admissible to demonstrate that defendant knew that the breast implants were defective at the time they were implanted); *Hoppe v. G.D. Searle & Co.,* 779 F.Supp. 1413, 1424–25 (S.D.N.Y. 1991) (admitting evidence of post-injury conduct in connection with the removal of an intrauterine contraceptive device because such evidence was relevant to pre-injury evidence supporting an award of punitive damages); *Lakin v. Senco Products, Inc.,* 144 Or.App. 52, 925 P.2d 107, 116 (1996) (affirming introduction of evidence relating to the defendant's post-accident conduct in connection with a products liability suit); *Chart v. General Motors Corp.,* 80 Wis.2d 91, 258 N.W.2d 680, 683 (1977) (ruling that subsequent remedial changes in an automobile are admissible in a products liability suit). Moreover, various courts have held that NHTSA reports, like the one introduced here, are admissible in collision cases. *See e.g., Nakajima v. General Motors Corp.,* 857 F.Supp. 100, 102 n. 4 (D.D.C.1994); *Cohen v. General Motors Corp.,* 534 F.Supp. 509, 511–13 (W.D.Mo.1982); *Livingston v. Isuzu Motors, Ltd.,* 910 F.Supp. 1473, 1496–97 (D.Mont.1995).

These authorities compel the introduction of evidence relating to Chrysler's post-accident conduct. Furthermore, this Court expressly instructed the jury that the post-accident evidence could not be considered to establish liability. (Tr. 2820) Such an instruction comports with *Gilbert,* 179 S.E.2d at 723 (holding that evidence tending to establish mitigating circumstances in favor of the defendant was admissible for purposes of punitive damages, but not for purposes of liability). The Court reaffirms its conclusion that this evidence properly was admitted.

### 4. *Other errors mentioned, but not briefed*

In its eighteen-page, single-spaced motion for judgment as a matter of law or alternatively for a new trial, Chrysler contends that the Court made over 100 reversible errors, primarily evidentiary rulings, during this trial. Chrysler's shotgun approach is ill-conceived for several reasons. First, Chrysler's motion disregards the Local Rules of the District of South Carolina, as well as the express order of this Court, respecting motions practice and page limitations. Second, the bulk of these alleged errors are being raised for the first time post trial or otherwise are waived—Chrysler cannot impute its own error to the Court. Third, many of Chrysler's challenges are cumulative or immaterial.

For instance, Chrysler's motion (a) raises arguments under the First Amendment for the first time, (b) asserts that the Court erred in charging the jury concerning "injury" to Sergio rather than the "death" of Sergio; in fact, after the charges at issue were given, counsel for Jimenez asked the Court to clarify that aspect of the charge, to which counsel for Chrysler stated "I think we would prefer to leave it as it is" (Tr. 2838); (c) asserts that the Court erred in failing to charge the jury that a manufacturer is not an insurer and does not have a duty to make a machine accident proof or foolproof, that a manufacturer does not have a legal duty to produce a product incorporating features representing the ultimate in safety and that mere proof of the happening of an accident does not amount to proof of negligence; in fact, instructions incorporating these precise concepts were given (Tr. 2808–11); (d) alleges a failure to give a *BMW*-appropriate punitive damages instruction, when Chrysler was instructed pre-trial to provide a suitable *BMW*-appropriate punitive damages instruction and the Court utilized the instruction proffered by Chrysler, (e) asserts prejudice from evidentiary rulings where Chrysler failed to request limiting instructions or otherwise failed properly or timely to object,

and (f) contends that a new trial is in order because Ms. Barrientos cried once during this trial (and promptly was ushered out of the courtroom).

Despite the nature of Chrysler's arguments, the Court has considered all of the issues raised by Chrysler on their merits to the extent fathomable. The Court finds, as a threshold matter, that the issues Chrysler raised in its motion, and that are not specifically discussed herein, are entirely without merit and, where inappropriately raised for the first time post-trial, also are waived. The Court finds further that, even if, alternatively, errors were made in any instruction or ruling upon the admission of evidence, no material prejudice resulted, particularly in light of the overwhelming evidence presented at trial on the dispositive issues.

### C. Damages

 The Supreme Court has instructed that "a district court sitting in diversity must apply state law standards to determine whether a verdict is excessive." *Steinke v. Beach Bungee, Inc.*, 105 F.3d 192, 197 (4th Cir.1997), *citing Gasperini v. Center for Humanities*, 518 U.S. 415, 116 S.Ct. 2211, 2224–25, 135 L.Ed.2d 659 (1996)). South Carolina courts employ the "shock the conscience" test for evaluating whether a verdict is grossly inadequate or excessive. Under South Carolina law, a motion for new trial absolute is founded upon a contention that the "verdict is grossly inadequate or excessive so as to shock the conscience of the court and clearly indicates the figure reached was the result of passion, caprice, prejudice, partiality, corruption or some other improper motives." *Vinson v. Hartley*, 324 S.C. 389, 477 S.E.2d 715, 723 (Ct.App. 1996). In such cases, the trial judge must grant a new trial absolute because the verdict is considered to be wholly unlawful and, therefore, no part of it may be permitted to stand. *Id.; see also, Elliott v. Black River Elec. Co-op.*, 233 S.C. 233, 104 S.E.2d 357, 372–73 (1958): *Krepps v. Au-*

*sen*, 324 S.C. 597, 479 S.E.2d 290, 295–96 (Ct.App.1996). A motion for new trial nisi remittitur, however, is founded upon a contention that the verdict is not inherently unlawful, but rather, under the facts of the case, is unduly liberal. *Elliott*, 104 S.E.2d at 372; *Krepps*, 479 S.E.2d at 295–96.

In addition to the above principles which govern South Carolina state trial courts, this court finds further guidance from the Fourth Circuit:

> [I]n determining ... whether the jury's verdict was rendered in accordance with South Carolina law, the district court should look to South Carolina cases to determine the range of damages in cases analogous to the one at hand. *See Imbrogno v. Chamberlin*, 89 F.3d 87, 90 (2d Cir.1996); *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1339 (5th Cir.1990). If the court believes that a departure from that range is justified, it shouldprovide the reasoning behind its view. If the court determines that there are no comparable cases under South Carolina law, it should explain this determination as well.

*Steinke*, 105 F.3d at 198.

In the instant case, this court was presented with a motion for new trial absolute, or, in the alternative, for new trial nisi remittitur. Guided by the principles set forth above, this court must now address South Carolina law in an effort to determine whether a South Carolina state court would find both the compensatory verdict and the punitive verdict in this case to be so excessive as to "shock the conscience" of the court, requiring the grant of a new trial absolute, and, if not, whether a South Carolina state court would find the awards to be unduly liberal, warranting the grant of a new trial nisi remittitur. The court will address the compensatory damages separately from the punitive damages.

#### 1. Compensatory Damages

 "In determining the damages recoverable under [South Carolina's]

Wrongful Death Statute, the question is not one of the value of the human life lost, rather it is the damages sustained by the beneficiaries from the death." *Lucht v. Youngblood,* 266 S.C. 127, 221 S.E.2d 854, 859 (1976). Therefore, Mr. Jimenez and Denise Barrientos, as the parents and statutory beneficiaries of Sergio, are entitled to recover damages they sustained as a result of Sergio's death. The recoverable elements of damages include pecuniary loss, mental shock and suffering, wounded feelings, grief, sorrow, and loss of society and companionship. *Id.,* 221 S.E.2d at 859; *Ballard v. Ballard,* 314 S.C. 40, 443 S.E.2d 802, 803 (1994). These elements "are intangibles, the value of which cannot be determined by any fixed yardstick. Their loss to the beneficiaries must be estimated by the jury in the exercise of their sound judgment under all the facts and circumstances of the case." *Lynch v. Alexander,* 242 S.C. 208, 130 S.E.2d 563, 567 (1963).

Wrongful death verdicts in South Carolina involving minor children and no pecuniary loss have ranged from $22,000 in 1952 to $3 million in 1996. Early cases considering the issue include *Hopkins v. Derst Baking Co.,* 221 S.C. 497, 71 S.E.2d 407 (1952) (holding $22,500 actual damages verdict for death of 2–year–old child not excessive); *Mock v. Atlantic Coast Line R. Co.,* 227 S.C. 245, 87 S.E.2d 830 (S.C.1955) (holding $50,000 actual damages plus $15,000 punitive damages for death of 12–year–old not excessive); *Smith v. Hardy,* 228 S.C. 112, 88 S.E.2d 865 (1955) (holding $40,000 actual damages, reduced by remittitur to $30,000, and $5,000 punitive damages for death of 18–year–old and 13–year–old not excessive); *Lynch v. Alexander,* 242 S.C. 208, 130 S.E.2d 563 (1963) (holding $40,000 actual damages for death of 18–year–old not excessive); and *Reid v. Swindler,* 249 S.C. 483, 154 S.E.2d 910 (1967) (holding $25,000 actual damages for death of 6–year–old not excessive); *Zorn v. Crawford,* 252 S.C. 127, 165 S.E.2d 640 (S.C.1969) (granting new trial because $250,000 verdict to parents of 15–year–old

girl not supported by the evidence and could only be explained upon the basis of sympathy, passion, or prejudice on the part of the jury).

In *Lucht v. Youngblood,* 266 S.C. 127, 221 S.E.2d 854, 858 (1976), the South Carolina Supreme Court ruled that "each case must be evaluated as an individual one, within the framework of its distinctive facts." The Court declined to follow the defendant's proposed "comparison approach" and upheld the verdict as not "monstrous or plainly unjust" (*id.* at 858–60) even though it was more than double the previous largest verdict in a similar case. *Id.* at 858–59. *See also TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 467, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (Kennedy, J., concurring) ("the size of the award ... is not the sole, or even necessarily the most important, sign" of "bias, passion, or prejudice").

The Court further explained its decision as follows:

"The loss to parents from the untimely death of a devoted child is not to be minimized." (citation omitted). These are intangibles, the value of which cannot be determined by any fixed yardstick. Their loss to the beneficiaries must be estimated by the jury in the exercise of their sound judgment under all of the facts and circumstances of the case. We cannot say that the size of the verdict is such as to indicate passion or prejudice on the part of the jury.

It is in the province of the jury to determine amounts to be allowed and a verdict should not be disturbed unless it is so flagrantly excessive as to raise a presumption that it was the result of passion and prejudice and not of sober, reflective judgment....

Although the amount of the verdict might be higher than heretofore awarded in this Court, we do not regard the verdict as 'monstrous' or 'plainly unjust.' There has not been a single trial event or evidentiary item, pointed out to us,

which might have induced the jury to act out of passion or prejudice. *Lucht*, 221 S.E.2d at 859.

Further, in *Knoke v. South Carolina Department of Parks, Recreation & Tourism*, 324 S.C. 136, 478 S.E.2d 256, 258–59 (1996), the Court, citing *Lucht*, found a $3 million award "not so grossly excessive as to shock the conscience." It did so even though the verdict was nine times greater than the highest previous award upheld by the South Carolina courts in a comparable case. In *Knoke*, 12 year old Jeremy Knoke died from asphyxiation after a fire started in a cabin at Cheraw State Park in 1991. Five boys were in the cabin sleeping when the fire broke out and all but Jeremy were able to escape. Jeremy's parents alleged the defendant was negligent in failing to provide a smoke detector in the cabin, and the jury returned the $3 million verdict.

■ Although there was no evidence of pecuniary loss introduced at trial, the court noted that both parents had testified about their grief, shock, and sense of loss from the death of their minor child. *Id.* In further support of its finding that "[t]he amount awarded [was] not so grossly excessive as to shock the conscience of the court," (*id.* at p. 258), the Court cited a 1986 West Virginia case which reduced a $10 million verdict to $3 million in a medical malpractice case arising from the wrongful death of a toddler. *Id.,citing Roberts v. Stevens Clinic Hospital, Inc.,* 176 W.Va. 492, 345 S.E.2d 791 (1986).

While Chrysler discounts *Knoke* as "an anomaly" and "aberrational," the Court reads the case as reflecting routine operation of a system of determining "intangible damages" that is marked by flexibility and "substantial deference" to the jury, rather than adherence to "any fixed measure." *Knoke*, 478 S.E.2d at 258–59; *see also Clark v. Ross*, 284 S.C. 543, 328 S.E.2d 91, 106 (Ct.App.1985). The court in *Knoke* did not indicate that $3 million was to be considered the upper range or cap for all such verdicts without regard for the indi-

vidual circumstances of other cases. On the contrary, the court, in upholding the jury's award of $3 million to the Knokes, cited the *Lucht* decision and reiterated that the verdict "was to compensate Jeremy's parents for [those] intangible damages which cannot be determined by any fixed measure." *Knoke* 478 S.E.2d at 258–59.

Finally, in an unpublished decision addressing a remittitur granted on remand by the District Court for the District of South Carolina, the Fourth Circuit held that the district court did not abuse its discretion by remitting a twelve million dollar verdict to six million. *See Steinke v. Beach Bungee, Inc.,* 1998 WL 230828 (4th Cir.1998). The court stated that the district court properly addressed the issue in that

> it carefully examined South Carolina case law to determine the range of damages previously awarded by that state's courts in similar cases and then provided a thoughtful and thorough analysis of the facts in this case, including [the child's] character, the violent circumstances surrounding his death, and the additional grief suffered by his parents as a result of having watched him die in such a terrible manner. The district court then reasonably concluded that these factors called for an award of damages significantly greater than any awards to date by South Carolina courts in similar wrongful death cases. The district court therefore complied with our instructions, demonstrating to the satisfaction of this court that it did indeed appropriately "exercise its considered discretion under applicable state law."

*Id.,* 145 F.3d 1325, 1998 WL 230828 at *4, citing *Steinke v. Beach Bungee, Inc.,* 105 F.3d 192, 198 (4th Cir.1997).

Although there was no evidence of pecuniary loss in this case, the evidence at trial of the mental shock and suffering, wounded feelings, grief, sorrow and loss of soci-

ety and companionship experienced by Sergio's parents as a result of his death was compelling. Witnessing Sergio's death was extremely hard on his mother, Ms. Barrientos. She became hysterical when she saw her son lying in the road, bleeding profusely from what was described as "a gaping hole in the side of his head." (Tr. 1076–77) It was equally devastating for Mr. Jimenez, who arrived on the scene only after his family had already been taken to the hospital. It was later at the hospital that Mr. Jimenez finally found Sergio and was so overcome with grief that he denied his son's death and pleaded with him to wake up. (Tr. 1170, 1172)

The evidence demonstrated that, before the collision, the Jimenez family was close and loving. *See, e.g.,* Tr. 1180. Mr. Jimenez and Ms. Barrientos experienced great joy in domestic life and exhibited all the characteristics of a loving family, with family life centered on the children, in general, and on six-year-old Sergio, in particular. *Id.* As Sergio's surviving sister Maria explained at trial, Sergio was his father's "heart" (Tr. 1055), and because Ms. Barrientos could bear no more children, Sergio remained her "baby." (Tr. 1082) Testimony showed that after the accident Barrientos and Jimenez parted company because they could not be in each other's presence without being painfully reminded of their son. Testimony further showed that Barrientos eventually felt compelled to leave South Carolina to escape the reminders of Sergio. Jimenez testified that his personality has changed drastically for the worse since he lost his only son, and now, he finds relief only in the dreams he has of Sergio.

Taking into account the most analogous cases to the situation at hand and having observed the trial and all of the witnesses in this case, this court concludes that the $12.5 million verdict for compensatory damages awarded in this case was not the result of passion, caprice, or prejudice on the part of the jury and, therefore, does not warrant the grant of a new trial absolute. However, in that determination, this court must also consider the defendant's arguments that Plaintiff's counsel made closing remarks that improperly prompted the jury to passion or prejudice. As just noted, the Court disagrees that the jury was so inflamed, and it rejects Chrysler's contentions as being without merit.

■ Chrysler did not object to any of the various remarks that it now challenges, yet contends that it is entitled to a new trial.[13] Timely failure to object at trial unequivocally results in waiver. *See, e.g., Bailey v. Turner,* 736 F.2d 963, 972 (4th Cir.1984) (holding that an issue cannot be challenged if no timely objection is made at trial); *DiPaola v. Riddle,* 581 F.2d 1111, 1113 (4th Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979) (opining that timely objections at trial are necessary to avoid waiver of the argument). Chrysler's failure to object to the remarks upon which it now focuses its argument precludes challenging them here because they are waived. As the Supreme Court has explained, counsel "cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (citation omitted). Under such circumstances "a new trial should not be granted." *Dennis v. General Elec. Corp.,* 762 F.2d 365, 367 (4th Cir.1985) (citation omitted). Because Chrysler failed to object to all but one of Jimenez's counsel's challenged closing re-

---

**13.** After closing, Chrysler's counsel "to have a complete record" moved for a mistrial concerning remarks in the rebuttal portion of the closing "to which [the Court] did not sustain the objection." (Tr. 2970) The only remarks to which an objection was made and not sustained were remarks objected to as "not rebuttal" and properly the subject of "opening statement." (Tr. 2787–88) This objection was without merit and the ruling, even if erroneous, was harmless error.

marks, Chrysler should not be heard to complain regarding the unopposed remarks.

Having presided over the five-week trial, and having had the opportunity not only to listen to the evidence but also to observe the jury, this Court finds that for the most part, counsel on both sides of this case conducted themselves in a calm manner throughout the trial. The counsel for plaintiffs did not appear to attempt to inflame the passions or prejudices of the jury, nor from observing the jury does the Court believe that occurred. There never was a "we/they" theme to Plaintiff's presentation. References to "South Carolina" occurred very infrequently and did not appear to be a play for local sympathy. Moreover, as his counsel pointed out in connection with the argument of the post-trial motions, Mr. Jimenez, himself, an immigrant from Mexico, would be unlikely to benefit from a plea to any perceived local South Carolina prejudice. Conversely, Chrysler, albeit headquartered in Michigan, has a substantial presence in South Carolina in that it advertises and maintains dealerships here. Chrysler neither is a stranger to South Carolina nor was treated as such by Plaintiff's counsel.

In determining if counsel's closing remarks are so prejudicial as to require a new trial, the material inquiry is whether, considered in the context of the trial as a whole, the challenged remarks affected the result of the trial. *See Smith v. National R.R. Passenger Corp.*, 856 F.2d 467, 472 (2d Cir.1988); *Smith v. Travelers Ins. Co.*, 438 F.2d 373, 375 (6th Cir.1971), *cert. denied*, 404 U.S. 832, 92 S.Ct. 79, 30 L.Ed.2d 62 (1971). Here, the trial lasted five weeks, entailing a voluminous amount of documentary evidence and testimony. While several specific points raised by Chrysler will be addressed below, the Court notes that the remarks of Mr. Jimenez's counsel that are the subject of Chrysler's motion paled in comparison to the arguments related to the facts. Listening to the arguments, and observing

the jury, the Court concludes that none of the challenged remarks played any role in the verdict or on liability or damages. The verdict was, in the Court's view, the fair product of the jury's analysis of the evidence presented.

■ The types of statements Chrysler complains about have been found not to be prejudicial in other cases. More particularly, Chrysler objects to references concerning the absence of corporate witnesses and to the fact that it is a large corporation. As to the former, Jimenez presented evidence at trial that individuals at high levels of the company participated in various bad acts. The thrust of the comments to which Chrysler now objects was that, if the evidence that Jimenez presented were not true, one reasonably would expect at least some of the people involved in the claimed wrongdoing to come to trial and deny it. For example, Sheridan testified that he was told by Ronald Zarowitz not to write anything down about the rear door latch (Tr. 1480–81) and by Chris Theodore that to make any changes would "indict" the latch (Tr. 1535). The thrust of plaintiff's counsel's point was that, if they were not true, one might expect that Chrysler would have offered Messrs. Zarowitz and/or Theodore, or other individuals with relevant knowledge, to rebut Sheridan's testimony. Chrysler executives had the opportunity to testify in the company's defense, and Jimenez's counsel properly pointed this out to the jury. *See Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir.1996). An isolated "David and Goliath" reference—not objected to—also does not necessitate a new trial, particularly where there was no pervasive "we/they" theme. *See Curtis Mfg. Co. v. Plasti–Clip Corp.*, 933 F.Supp. 107, 116 (D.N.H.1995), *rev'd on other grounds*, 135 F.3d 778 (Fed.Cir. 1998) (counsel's references to his client as the little guy were not prejudicial because the court later instructed the jury to treat the parties equally). The plain fact is that Chrysler is a very large corporation by any standard and its size is peculiarly rele-

vant to punitive damages, as examined below.

Chrysler also challenges Jimenez's counsel's reference to a specific dollar amount in closing argument. In *Mosser v. Fruehauf,* 940 F.2d 77, 82 (4th Cir.1991), the Fourth Circuit refused to order a new trial because the reference to a specific dollar amount was not necessarily prejudicial and the defendant had failed to request a curative instruction. Here, Jimenez's counsel did not tell the jury how much money to award, but referred to monetary amounts merely as part of a larger point. It clearly was not prejudicial since the jury did not award the specific amount that counsel mentioned. *See Hawkins v. Pathology Associates of Greenville, P.A.,* 330 S.C. 92, 498 S.E.2d 395 (1998) (finding counsel's statements harmless where jury's award differs from counsel's suggestion). In any event, Chrysler made no objection or request for a curative instruction.

With respect to counsel's remark that the jury was the "conscience of the community," the Court believes that the remark neither was intended to nor did inflame or impassion the jury, but rather remind them of the seriousness of the task of awarding punitive damages. In a sense, the jury, on the punitive damages issue, truly is the conscience of the community, because it is charged with responsibility for determining the reprehensibility of conduct and what the appropriate punishment and deterrent may be. Additionally, the reference in this case to "conscience of the community" was made in an entirely different context from that in *Westbrook v. General Tire & Rubber Co.,* 754 F.2d 1233 (5th Cir.1985). In *Westbrook,* the reference was made not in the context of a punitive damages claim but in the context of liability and was, as the court in *Westbrook* found, part of a much larger and pervasive appeal to a "we/they" prejudice. Moreover, in *Westbrook,* unlike in the instant case, counsel for the defendant objected to the argument and preserved its position. Here, the reference to "con-

science of the community" was not part of an appeal to prejudice, was made in an appropriate contextual setting—punitive damages—and was not objected to.

Chrysler also complains about references to Detroit. While there were several isolated references to Detroit, in context, that was not the focus of counsel's argument nor was it an improper attempt to play on regional differences. Chrysler did not object to such argument at the time, presumably because it did not appear to be inflammatory. Indeed, a more direct "regional reference" was upheld in *DeRance, Inc. v. PaineWebber Inc.,* 872 F.2d 1312, 1326–27 (7th Cir.1989) (upholding verdict where plaintiff's counsel referred to "Wall Street" when discussing PaineWebber because argument was merely a "colorful variation of the argument that punitive damages must serve as an example to the particular community, and here that particular community was large Wall Street brokerage houses"). Because a new trial should only be granted where counsel's argument "causes prejudice to the opposing party and unfairly influences a jury's verdict," *Pappas v. Middle Earth Condominium Ass'n,* 963 F.2d 534, 540 (2d Cir.1992), no new trial is necessary here.

Finally, the Court rejects Chrysler's suggestion in its moving papers, and reiterated at oral argument, that the Court discouraged it from objecting. While the Court did encourage the parties to desist from making objections "to impress your fellow lawyers or somebody in the audience or yourself" (Tr. 11), it certainly did not issue a blanket prohibition on objections under all circumstances. To the contrary, the Court expressly recognized that "[s]ometimes you can't help it." (Tr. 11) Moreover, Chrysler's counsel did object both during opening and closing when they apparently felt it was necessary to do so. (Tr. 48–49, 2784, 2787) Most of the matters it now challenges were not objected to during trial, probably because they did not appear objectionable when they were oc-

curring. The Court declines to accept responsibility for Chrysler's tactical decision.

While Chrysler argues that the "only rational explanation for the verdict is that the jury lost itself in a sea of emotion, anger and sympathy," (Defendant's memorandum in support of motion, p. 24), the evidence presented by Plaintiff showed otherwise. Having determined that the compensatory damage award was not the result of passion and prejudice, this court concludes that Chrysler is not entitled to a new trial absolute on the compensatory award. This court must now consider remittitur of the compensatory damage award.

South Carolina law charges a jury with calculating compensatory damages, and its determinations are not governed by ironclad rules, but the particular facts of each case. *See Lucht*, 221 S.E.2d at 859. In calculating compensatory damages, a jury exercises great discretion, and its compensatory damages award will not be disturbed absent compelling reasons. *See Bailey v. Peacock*, 318 S.C. 13, 455 S.E.2d 690, 691 (1995). On state law grounds, the standard for remittitur is whether the damages are "over-liberal." *See Hicks v. Herring*, 246 S.C. 429, 144 S.E.2d 151, 154 (1965). The record in this case amply supports the conclusion that Sergio's death resulted in severe mental shock and suffering, wounded feelings, grief and sorrow, loss of companionship, and loss of comfort and society to his parents.

Looking to South Carolina cases and the particular facts of this case, the Court observes that the South Carolina Supreme Court in *Knoke* approved a $3 million award without comment on whether that amount approached an upper limit on such damages. 478 S.E.2d at 258–59. The facts in this case are more compelling than in *Knoke*. Here, unlike in *Knoke*, Sergio's mother witnessed his death, and the family broke up thereafter. This case is also distinguished from *Knoke* and *Steinke* in that the decedents in those cases were 12

and 17 years old, respectively. Sergio was only 6 years old when he was killed. While the pain of losing a child of any age is incalculable, Sergio's parents were deprived of what Mr. Jimenez's counsel described at oral argument as "the golden years of parenthood."

Additionally, the district court in *Steinke* initially approved the jury's $12 million award, *see Steinke*, 105 F.3d 192 (4th Cir. 1997), and then on remand, went beyond *Knoke* to approve $6 million. *See Steinke*, 1998 WL 230828 (4th Cir.1998). At the time that case was received on remand, there was no verdict of similar magnitude to which the district court could refer. This Court, however, has the benefit of the *Steinke* jury's $12 million award when looking to similar cases and finds the existence of that verdict additional information to process in the determination on remittitur.

This court concludes that the compensatory damage award in this case was unreasonably beyond the range of damages awarded in wrongful death cases involving children in South Carolina and therefore should be reduced because it was unduly liberal. This court is of the opinion that the loss is greater than that in *Knoke* for the reasons stated and after consideration of all the facts and circumstances, this court believes that an award of Nine Million ($9,000,000) is fair, amply justified and one that would be found appropriate by the South Carolina courts. Judgment will be rendered accordingly.

### 2. Punitive Damages

Before discussing punitive damages, the Court necessarily places that award in context. Although the amount of damages awarded admittedly would be large to virtually any individual and to most businesses, Chrysler is neither an individual nor like most businesses. Rather, it is a multi-billion dollar corporation. The evidence established that Chrysler has a net worth exceeding $11.5 billion (Deposition

of Robert Eaton, at 151–52), earned more than $13 billion in profits in the past three years (*id.* at 151), earned profits of approximately $13 billion just on minivan sales from 1987 through 1995 (Plaintiff's exhibit 252), and has $6.9 billion in cash on hand (Deposition of Robert Eaton, at 159). Thus, the verdict represents a small percentage of Chrysler's net worth and recent profit; it allows the company to keep approximately ninety-eight percent of the minivan profits it earned before Sergio's death; and, even at an interest rate of only five percent, it amounts to less than nine months interest on Chrysler's available cash.

That is not to say, however, that every punitive damage award against a company of great wealth must be of this magnitude simply because the company easily can afford to pay. To the contrary, substantial awards should be few and far between, reserved for the rare case where egregious misconduct, extending over a long period of time and reaching to the top of the corporation, has resulted in extreme consequences for its victim and huge profits for its perpetrators. Within that context, the Court explains why this case merits the punitive damages that the jury awarded.

As explained supra, under South Carolina law, a motion for new trial absolute is founded upon the contention that the "verdict is grossly inadequate or excessive so as to shock the conscience of the court and clearly indicates the figure reached was the result of passion, caprice, prejudice, partiality, corruption or some other improper motives." *Vinson v. Hartley,* 324 S.C. 389, 477 S.E.2d 715, 723 (Ct.App. 1996). In these cases, the verdict is considered to be wholly unlawful and the trial judge must grant a new trial absolute. A motion for new trial nisi remittitur is founded upon a contention that the verdict is not inherently unlawful, but rather, under the facts of the case, is unduly liberal. *Elliott v. Black River Elec. Co-op.,* 233 S.C. 233, 104 S.E.2d 357, 372 (1958);

*Krepps v. Ausen,* 324 S.C. 597, 479 S.E.2d 290, 295–96 (Ct.App.1996).

The duty to impose and calculate punitive damages rests exclusively with the jury, which exercises great discretion in this regard. *See Miller v. City of West Columbia,* 322 S.C. 224, 471 S.E.2d 683, 687 (1996). While the jury is charged with determining the amount of punitive damages to be imposed, that determination is reviewed by the trial judge if challenged on excessiveness grounds. *See Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350, 354–55 (1991). In reviewing the excessiveness of the amount of punitive damages, a South Carolina trial judge considers, and therefore pursuant to *Gasperini,* this court will consider:

> (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally (8) . . . "other factors" deemed appropriate.

*Id.* at 354 (citation omitted). *See also* Owen, 74 Mich.L.Rev. at 1314–19 (proposing and examining nine similar factors). Additionally, the jury was instructed on these factors. Applying the *Gamble* factors, the Court finds that the punitive damages here are not excessive. First, Chrysler's actions were extraordinarily culpable. It designed the liftgate latch by recklessly resurrecting an outmoded, unsafe design that long before had been discarded as completely inadequate for use in passenger vehicles; failed to test the latch before placing a defective product in the stream of commerce; though fully cognizant of the grave risk and fact of serious injuries and deaths, consciously refused to remedy the defect; attempted in various ways to conceal its wrongdoing; and continued to sell the "safety" of its minivans, reaping billions of dollars in profits along

the way. This gross disregard for public safety has resulted in the deaths of Sergio and perhaps as many as 36 other persons, as well as apparently numerous other injuries.

Second, Chrysler possessed this knowledge for over a decade before it finally was forced to take steps to attempt to remedy the defect.

Third, Chrysler knew that its minivans contained a defective, dangerous latch. Giving Plaintiff Jimenez the benefit of appropriate inferences, the evidence showed that Chrysler made a concerted effort to conceal this fact by selectively destroying crash test data and other potentially harmful evidence, ordering the Minivan Safety Leadership Team not to write down anything about the latch, withholding information from government investigators, attempting, in its words, to "squash" a government recall of the latch, and misleading owners in its eventual communications with consumers.

Fourth, from the first such accident in 1985, Chrysler ignored similar incidents of which it was on notice where persons were killed or injured as a result of liftgate latch failures. Had Chrysler acted to remedy the latch defect then, Sergio would not have been killed.

Fifth, a substantial award is necessary to affect the profitability Chrysler achieved by this conduct and deter it from engaging in such conduct in the future. Indeed, despite the punitive damages award here, Chrysler persists in denying that its liftgate latch was defective and has not ensured that all minivan owners have their latches replaced; roughly 600,000 minivans with the same defective latch that killed Sergio remain in use. *See* Plaintiff's exhibit 316.

Sixth, the punitive damages are reasonably related to the harm likely to result. The ratio of punitive damages awarded to the compensatory damages awarded by the jury is only 20 to 1, and even taking this court's remittitur into account the ratio would still only be 28 to 1, either a perfectly appropriate ratio especially where, as here, reprehensible conduct has resulted in a death. *See, e.g., Elder v. Gaffney Ledger, Inc.,* 333 S.C. 651, 511 S.E.2d 383 (Ct.App.1999) (approving a 30:1 ratio); *Cock–N–Bull Steak House Inc. v. Generali,* 321 S.C. 1, 466 S.E.2d 727, 731–32 (1996) (approving 28 to 1 ratio for bad faith failure to pay); *Lister v. Nations-Bank of Delaware, N.A.,* 329 S.C. 133, 494 S.E.2d 449 (Ct.App.1997) (approving 23 to 1 ratio for fraud). According to NHTSA, 37 people may have been killed as a result of the defective latch and numerous others may have been injured. Other persons are potentially subject to suffer injuries since thousands of minivans with defective latches remain on South Carolina highways alone.

Seventh, in view of Chrysler's financial resources, it clearly has the ability to pay this award and never has contended otherwise.

In sum, the Court finds the punitive damages that the jury awarded are well-justified and not the result of passion or prejudice. Further, the court finds that the punitive damages should not be remitted. The Court reaches this conclusion both through application of the *Gamble* factors and by a general assessment that they are not overliberal.

Similarly, federal law does not counsel remittitur of the punitive damages award. Contrary to Chrysler's assertion, *Steinke* requires no different result. There simply are no South Carolina cases comparable to this one in the magnitude of the conduct, the potential harm, and the amount of money necessary to punish and deter. Given Chrysler's wealth and the profitability of its minivan line, a more appropriate comparison would be to the $1 billion punitive damage award approved in *Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768 (Tex. App.1987). *See Knoke,* 478 S.E.2d at 258 (looking to out-of-state case to support damage award that exceeds prior South Carolina cases).

Finally, under *Atlas Food Systems and Services, Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587 (4th Cir.1996), this Court exercises "independent judgment" to determine whether the punitive damages award will result in a miscarriage of justice. The Court is acutely aware of the size of the award in this case and, while conscious of the jury's role in this process, does not intend simply to rubber stamp the verdict or pay more deference than is due. Rather, bringing to bear the experience of a lengthy tenure on the bench assessing penalties in both civil and criminal matters and the benefit of having tried this case, the Court, in the exercise of its independent judgment, concludes that the punitive damages award is not so large as to work an injustice. *See id.* at 594.

### 3. *Constitutionality of Punitive Damages*

Finally, Chrysler seeks to have the Court declare that the punitive damages award violates the Constitution on First and Fourteenth Amendment grounds. For both procedural and substantive reasons, the Court rejects Chrysler's argument.

Chrysler premises its First Amendment challenge on two constructs. First, Chrysler argues that imposing punitive damages for negligent misrepresentation improperly punishes it for commercial speech because there has been no showing that Chrysler acted with actual malice. Second, Chrysler claims that imposing punitive damages here infringes its right to petition the Government—NHTSA and Congress—to prevent a recall of the minivans.

The Court finds that Chrysler waived its First Amendment challenge. It did not even mention the phrase "First Amendment" in this case until its post-trial motion for judgment as a matter of law or alternatively for a new trial. Nor did Chrysler seek a jury instruction that actual malice must be found as a prerequisite to punitive damages or that the jury could not punish Chrysler for petitioning the Government. Despite ample opportunity to raise its First Amendment concerns in limine, at the close of Plaintiff's case, at the close of all the evidence, or during argument on jury instructions, and to object to evidence on those grounds, Chrysler failed to do so. *See Campus Sweater & Sportswear v. M.B. Kahn Constr. Co.,* 515 F.Supp. 64, 108 (D.S.C.1979), *aff'd,* 644 F.2d 877 (4th Cir.1981) ("[N]ew trial should not be granted on the basis of a theory which was not urged at trial although it could have been."); *see also Mosser v. Fruehauf Corp.,* 940 F.2d 77, 85 (4th Cir.1991) (holding that failure to seek instructions leaves no room for a party to complain). Relying on *BMW of North America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), Chrysler claims that the punitive damages award is so grossly excessive that it did not receive fair notice of the severity of the penalty, thereby violating the Due Process Clause of the Fourteenth Amendment.

In *BMW,* the Supreme Court held that a $2 million punitive damages award based on BMW's fraud in failing to disclose to a purchaser that his new car had been repainted was "grossly excessive" and thus unconstitutional. *See BMW,* 116 S.Ct. at 1602–04. In *BMW,* the Court explicitly embarked on a course "to illuminate 'the character of the standard that will identify constitutionally excessive awards' of punitive damages." *Id.* at 1595 (quoting *Honda Motor Co. Ltd. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 2335, 129 L.Ed.2d 336 (1994)). The Court explained that a defendant must receive fair notice "not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." *Id.* at 1598. The Court then erected three "guideposts" for determining if a defendant had adequate notice of the size of the sanction that a state might impose based on a defendant's misconduct. *Id.* at 1598–99. In expounding on these guideposts, the Court noted that the preeminent

guidepost is the reprehensibility of the defendant's conduct. *Id.* at 1599. The second guidepost is the ratio of punitive damages to the actual harm. *Id.* at 1601. The third guidepost is the analysis of sanctions for comparable misconduct. *Id.* at 1603. Measured against these guideposts, the punitive damages award here more than passes constitutional muster.

As a threshold matter, Chrysler does not and cannot argue that it lacked fair notice that its actions could warrant punitive damages. Because 200 years of South Carolina law provide that egregious conduct results in the assessment of punitive damages, *see Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258, 261–62 (1958), Chrysler received fair notice that its conduct could result in that sanction. *See TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 465–66, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *Campus Sweater*, 515 F.Supp. at 108 n. 129. Accordingly, the Court now turns to the notice of the severity of the penalty and the three *BMW* guideposts.

The Supreme Court identified the reprehensibility of the defendant's conduct as probably the most important guidepost. *BMW*, 116 S.Ct. at 1599. Chrysler's reckless conduct is, as previously set forth at length, especially egregious and includes all of the "aggravating factors" that the Supreme Court associated with "particularly reprehensible conduct:" (1) the harm Chrysler inflicted was not "purely econom-

ic" in nature, but was the violent death of a six-year-old child—and perhaps as many as 36 others, to say nothing of numerous injuries; (2) Chrysler's conduct directly compromised the "performance and safety" of the public; and (3) Chrysler's conduct evinced "indifference to or reckless disregard for the health and safety of others." *Id.* at 1599. Furthermore, Chrysler's conduct would be considered unlawful under the products liability law of every state, involved repeated and interrelated wrongful acts over many years, included concealment and destruction of evidence, and involved deliberate false statements. *See id.* at 1601; *Continental Trend Resources Inc. v. OXY USA, Inc.*, 101 F.3d 634, 638 (10th Cir.1996), *cert. denied,* 520 U.S. 1241, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997); *TXO*, 509 U.S. at 462, 113 S.Ct. 2711 (affirming a "large" punitive damages award "in light of the amount of money potentially at stake, the bad faith of the [defendant], the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth"). Moreover, Chrysler's conduct was not confined to that of low-level employees, but instead reached the top of the corporate structure. Because this case exhibits virtually all of "the circumstances ordinarily associated with egregiously improper conduct," "strong medicine" in the form of "a substantial punitive damages award" is required. *BMW*, 116 S.Ct. at 1601.[14]

14. In his summary of factors going to reprehensibility ("flagrancy") in this context, Professor Owen, in his classic article, could have been writing about Chrysler's conduct in this case:

First, a manufacturer's fault in failing to deal with a product hazard increases with the magnitude of the resulting potential for harm to the public. Second, as the costs of reducing such a hazard to an acceptable level diminish, so also does the credibility of excuses for failing to do so. Third, as the manufacturer's awareness of the existence, magnitude, and means to reduce a product hazard increases, so too does its duty to address the problem and its culpability for failing to do so. Fourth, the nature and

duration of a manufacturer's failure to respond appropriately to a product hazard, its reasons for not responding more appropriately, and the nature and extent of any measures actually taken, all shed light on the extent to which the enterprise values profits over safety, and, accordingly, on its culpability. Finally, if the manufacturer created the danger deliberately, as by knowingly deceiving the public about the product's safety, it will usually be especially blameworthy and deserving of punishment. 74 Mich.L.Rev. at 1370. The article concludes: "By making the flagrant disregard of the public safety costly, the punitive damages remedy converts the profit motive into a posi-

The second guidepost—the ratio of punitive damages to actual damages—also supports the jury's verdict. While there is no mathematical bright line between constitutionally acceptable and unacceptable ratios, *BMW,* 116 S.Ct. at 1602, the ratio here is well within the range that the Supreme Court has approved in other cases. Thus, in *TXO,* the Court affirmed an award of punitive damages that was 526 times the actual damages. *See* 509 U.S. at 468–69, 113 S.Ct. 2711. And, in two cases that the Court had held pending its decision in *BMW,* it allowed ratios of 750 to 1 and 19 to 1 to stand. *See Murray v. Laborers Union Local No. 324,* 55 F.3d 1445 (9th Cir.1995), *cert. denied,* 517 U.S. 1219, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996) (750 to 1); *Pickering v. Owens–Corning Fiberglas Corp.,* 265 Ill.App.3d 806, 203 Ill.Dec. 1, 638 N.E.2d 1127 (1994), *appeal denied,* 158 Ill.2d 564, 206 Ill.Dec. 845, 645 N.E.2d 1367 (1994), *cert. denied,* 517 U.S. 1243, 116 S.Ct. 2496, 135 L.Ed.2d 188 (1996) (19 to 1). Moreover, the ratio in this case compares favorably with ratios in other cases. *See, e.g., Continental Trend,* 101 F.3d 634 (approving 22 to 1 ratio of punitive to actual damages in an economic injury case after remand in light of *BMW*); *Cock–N–Bull Steak House v. Generali Ins.,* 321 S.C. 1, 466 S.E.2d 727, 731–32 (1996) (28 to 1). Indeed, the South Carolina Court of Appeals, applying *BMW,* approved a punitive damages award that is 23 times the actual damages. *Lister v. NationsBank,* 329 S.C. 133, 494 S.E.2d 449, 459 (Ct.App.1997). And this Court has approved awards with higher ratios and has noted the South Carolina Supreme Court's approval of greater ratios. *Ross v. Jackie Fine Arts, Inc.,* 1991 WL 213815 at *8 (awarding punitive damages against one defendant almost 20 times actual damages); *Palmetto Fed. Savings Bank v. Industrial Valley Title Ins. Co.,* 756 F.Supp. 925, 935–36 (D.S.C.1991) (noting South Carolina Supreme Court's approval of ratios far in excess of 20 to 1).

The instant award also fares well when the *potential* harm from Chrysler's conduct is considered, as *BMW* indicates is appropriate. *See BMW,* 116 S.Ct. at 1602. NHTSA has associated 36 other deaths with Chrysler's defective latch, and about a million minivans with defective latches remain on the nation's highways. But considering only the potential harm to passengers in the thousands of such minivans in South Carolina would produce a ration that is minuscule. Even confining the potential harm to that which could have been inflicted on the five other members of the Jimenez family, who also were exposed to this particular hazard, results in an indisputably acceptable ratio. *See id.* (characterizing the ratio approved in *TXO* as 10 to 1 when potential harm is taken into account).

In its reply brief, Chrysler points out that numerous courts have struck down punitive damages awards where the ratio was less than the 20 to 1 ratio here and cites three cases in support. While Chrysler's statement is true, it lacks the significance that the company attaches to it. The punitive damages in those cases were reduced not because the ratio was too high as an absolute constitutional matter, but because the facts did not justify awards that high. *See Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 415 (S.D.N.Y.1996) (reducing award because the conduct was "not repugnant" and involved only a single incident); *Utah Foam Prods. Co. v. Upjohn Co.,* 930 F.Supp. 513, 532 (D.Utah 1996), *aff'd* 154 F.3d 1212 (10th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1358, 143 L.Ed.2d 519 (1999) (reducing award because it was excessive on the facts of the case); *see also Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 943–44 (5th Cir.1996), *cert. denied,* 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997) (noting only that Supreme Court had characterized a ratio of 4 to 1 as close to the line, but neglecting to note that *TXO* had approved a ratio of 10 to 1

tive force for the promotion of product safe-
ty." *Id.* at 1371.

considering potential harm, and citing other factors for its decision). The Court remains of the view that the ratio in this case is not constitutionally improper.

The third guidepost involves "[c]omparing the punitive damages award and the civil or criminal penalties" for comparable misconduct. *BMW*, 116 S.Ct. at 1603. Analysis of this factor presented no difficulty in *BMW* because Alabama and many states limited criminal and civil fines for deceptive trade practices and other offenses similar to those at issue. Analysis in the instant case is not as direct because, as the Supreme Court of Alabama noted in *BMW* on remand, if statutory penalties for the conduct in question are low or do not exist, "a consideration of the statutory penalty does little to aid in a meaningful review of the excessiveness of the punitive damages award." *BMW of N. Am., Inc. v. Gore*, 701 So.2d 507, 514 (Ala.1997).

To the extent that the final *BMW* guidepost is relevant at all here, the Court finds that it also supports the jury's verdict. Chrysler cites several South Carolina monetary sanctions for accidents resulting in death and felonies involving fraud, with criminal fines that range from $5,000 to $25,000. While the amounts are very small compared to the punitive damages awarded here, these fines are intended to punish and deter *individual* wrongdoers, not corporations. *See Continental Trend*, 101 F.3d at 641 (explaining that "$50,000 may be awesome punishment for an impecunious individual defendant but wholly insufficient to influence the behavior of a prosperous corporation"); *Campus Sweater*, 515 F.Supp. at 107–08 (noting the difference between corporations and individuals). Chrysler's pre-tax income on minivans alone is roughly 50,000 times that of an average South Carolina family. *Compare* United States Dep't of Commerce, Statistical Abstract of the United States 465 (116th ed. 1996) (Table No. 716) (average income of a South Carolina family approximately $30,000) *with* Chrysler's Profit Statement (an average year's

profits on minivan sales of approximately $1,500,000,000). *See* Plaintiff's exhibit 252. Therefore, a comparable monetary sanction for Chrysler would be between $250 million and $1.25 billion.

Moreover, under South Carolina law, reckless conduct by an individual resulting in death can result in prosecution for involuntary manslaughter. S.C.Code Ann. §§ 16–3–50 to 16–3–60 (Law.Co-op.1976) (5 years imprisonment). The availability of substantial jail sentences in that context demonstrates the propriety of a substantial punitive damages verdict here. *See BMW*, 116 S.Ct. at 1603 (noting that the potential for imprisonment counterbalances the small size of the statutory fine). As the South Carolina Court of Appeals recently stated, "We find although the punitive damages award greatly exceeds the maximum monetary fine for comparable misconduct, the term of imprisonment balances the comparison of the punitive damages award and the statutory penalties." *Lister*, 494 S.E.2d at 459–60.

In its final *BMW* argument, Chrysler contends that it was improperly punished for out-of-state conduct. The Court concludes that Chrysler cannot raise this argument, and that there is no merit to it in any event.

Chrysler filed a motion in limine seeking to exclude evidence relating to its minivan sales and other activities occurring outside the state of South Carolina. The Court, relying on *BMW*, 116 S.Ct. at 1598 n. 21, held that evidence of out-of-state activities is admissible to show the degree of reprehensibility of defendant's conduct. It directed the parties to submit proposed *BMW* appropriate jury instructions on punitive damages. The Court gave Chrysler's proffered punitive damages instruction. Chrysler cannot now claim that its own instruction should have been narrower.

With respect to the merits of Chrysler's claim, while it is true that a state cannot punish a defendant "for conduct that was

lawful where it occurred and that ha[s] no impact on [state] residents," *BMW,* 116 S.Ct. at 1597, Chrysler's conduct in selling a negligently designed vehicle and misrepresenting its safety plainly is unlawful in every state, and consequently it is not protected under *BMW. SeeNeibel v. Trans World Assur. Co.,* 108 F.3d 1123, 1131 (9th Cir.1997). Additionally, Chrysler sales outside South Carolina do affect the citizens of South Carolina insofar as they affected Chrysler's decision whether to recall minivans with the defective latch mechanism on a national basis. One can imagine a Chrysler executive reasoning as follows: "if I do not recall this latch I may have to pay millions in punitive damages in South Carolina, but I will make that up in profits in the other forty-nine states. I should just take my medicine in South Carolina in the interest of avoiding a national recall." South Carolina has a legitimate state interest in avoiding this sort of cost-benefit analysis calculation to protect its own citizens, and a punitive award intended to stop this sort of calculus is fully consistent with *BMW. See* Owen, 74 Mich. L.Rev. at 1371 (punitive damages assessments in proper products liability cases result in "undercutting the profitability of marketing misbehavior [b]y making the flagrant disregard of the public safety costly").

The Court also notes the punitive damages awarded were approximately 1/50th of Chrysler's national profits on minivans at the time of Sergio's death; South Carolina is one state out of 50. Thus, the jury's award represents a rough approximation of the minivan profits Chrysler earned in South Carolina. While a more precise measurement might be preferable, Chrysler does not dispute Plaintiff's assertion that Chrysler failed to provide a South Carolina-specific figure in discovery. *See, e.g.,* Plaintiff's exhibit 252.

In sum, Chrysler's arguments concerning punishment for out-of-state conduct are procedurally barred, because the Court used the instruction that Chrysler requested and are without merit in any event because the conduct at issue was improper in all states and the damages awarded are not inappropriate even if solely to protect the interests of South Carolina citizens.

## III. DEFENDANT'S RULE 60 MOTION FOR NEW TRIAL

Chrysler also moves for new trial pursuant to Federal Rule of Civil Procedure 60. According to Chrysler, new evidence in this case warrants a new trial. Federal Rule of Civil Procedure 60(b) states in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:

. . .

(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(6) any other reason justifying relief from the operation of the judgment.

Fed.R.Civ.P. 60(b).

After a searching examination of the materials filed in support of Defendant's motion pursuant to Rule 60(b), this court finds that the motion is meritless. The "new" evidence alleged by Defendant was irrelevant to this action, not evidence of any fraud, misrepresentation, or misconduct of Plaintiff or Plaintiff's counsel, and clearly not grounds for new trial.

Chrysler cannot prevail under any of the arguments that it advances, either in its motions for judgment as a matter of law or for a new trial. After painstakingly examining the record and the applicable law, and exercising its discretion and independent judgment, where appropriate, the Court denies Chrysler's motion on all

grounds except remittitur of the compensatory damage award. Accordingly, it is

**ORDERED** that Chrysler's Rule 50 motion for judgment as a matter of law is denied; and it is,

**ORDERED FURTHER** that Chrysler's Rule 59 and Rule 60 motions for new trial absolute are denied; and it is

**ORDERED FURTHER** that Chrysler's Rule 59 motion for new trial nisi remittitur is granted in part and denied in part. Finally, it is

**ORDERED FURTHER** that unless, within ten days after service on the Plaintiff's attorney of a copy of this Order, the Plaintiff files with the Clerk of Court a written consent to reduce the actual damages verdict to Nine Million Dollars ($9,000,000), then the motion for a new trial on the issue of compensatory damages will be granted.

**AND IT IS SO ORDERED.**